796 A.2d 879

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. NOEL REYES, DEFENDANT–RESPONDENT.

Argued February 13, 2002—Decided May 21, 2002.

*James L. McConnell,* Assistant Prosecutor, argued the cause for appellant (*Wayne J. Forrest,* Somerset County Prosecutor, attorney; *Tara L. Johnson,* on the brief).

*Robert J. Ferb* argued the cause for respondent (*Mr. Ferb,* attorney; *Joan Sabat–Schmid,* on the briefs).

*Risa E. Kaufman* argued the cause for *amicus curiae* New Jersey Coalition for Battered Women, Inc. (*Gibbons, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Ms. Kaufman* and *Lawrence S. Lustberg,* on the briefs).

*Carol M. Henderson,* Assistant Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*David N. Samson,* Attorney General, attorney).

*Nancy Goldhill* argued the cause for *amicus curiae* Legal Services of New Jersey (*Melville D. Miller, Jr.,* President, attorney).

The opinion of the Court was delivered by

ZAZZALI, J.

This appeal requires us to determine whether the Prevention of Domestic Violence Act of 1991, *N.J.S.A.* 2C:25–17 to –33 (Domestic Violence Act or Act), authorizes New Jersey courts to issue domestic violence restraining orders when the victim has fled to New Jersey in order to seek shelter from abuse that occurred out-of-state and the abuser commits an act of domestic violence in New Jersey.

The trial court issued a Final Restraining Order (FRO) to Florinda Silva (Silva) based on a finding that her husband, defendant Noél Reyes, struck Silva at their residence in New York. The Appellate Division reversed, reasoning that New Jersey courts lack jurisdiction to issue an FRO based solely on an act of domestic violence occurring out-of-state. Because the record demonstrates that an act of domestic violence did occur in New Jersey, thus conferring jurisdiction on our courts, we reverse. We also hold that when the only act of domestic violence occurred out-of-state, New Jersey courts nevertheless may assert jurisdiction when the victim seeks refuge in New Jersey and the defendant pursues the victim in this State for the purpose of making contact with the victim.

I

Defendant and Silva were married and living together with their child in the Bronx, New York. On the morning of April 27, 2000, the couple argued. In the presence of their child, defendant screamed at Silva and slapped her in the face. After defendant left for work, Silva telephoned her sister, who lives in Somerville, New Jersey, asking for help. Her sister subsequently picked up Silva and her child in New York and brought them to her Somerville apartment.

That evening defendant arrived at the Somerville apartment seeking to speak with Silva. Defendant claimed that he wanted to give Silva money for their child, but Silva denied defendant entry into the apartment. Nevertheless, defendant repeatedly knocked on the door and rang the doorbell. Frightened, Silva and her sister called the Somerville police who arrived shortly thereafter. Silva told the police of the incident that morning in New York that led her to seek shelter in New Jersey. The officers transported Silva and her sister to the police station. There, Silva filed a Domestic Violence Civil Complaint describing the events that had occurred that evening at her sister's apartment. She added that she had fled to New Jersey because defendant had struck her at

their home in New York. Silva also marked the box next to the word "harassment" on the complaint.

Later that night, a judge of the Somerville Municipal Court issued a Temporary Restraining Order (TRO) against defendant. The TRO prohibited defendant "from returning to the scene of violence" and from "future acts of domestic violence;" barred defendant from the sister's residence in Somerville; and prohibited defendant "from having any oral, written, personal or other form of contact with" or "stalking [or] following" Silva or her sister. The Order was returnable before the Somerset County Superior Court on May 4.

According to Silva, defendant returned to the Somerville apartment on April 28 and 29 in an effort to speak with Silva, prompting her to contact the police. Based on those events, a judge issued a warrant for defendant's arrest for violating the TRO. Defendant was released on his own recognizance. The complaint was dismissed in June 2000, pursuant to a plea agreement. However, there is no record evidence concerning that event other than Silva's sworn complaint, the Municipal Court order, and defendant's arrest. Accordingly, we consider the incidents of April 28 and 29 only as background.

On May 4, the return date of the TRO, both parties appeared *pro se* at the Somerset County Courthouse. Silva informed the court that defendant had attempted to speak with her that morning prior to the hearing. She added that "he doesn't leave me alone." Defendant admitted that he had asked Silva that morning to withdraw the complaint. Consequently, the court informed Silva that she could file a complaint against defendant for "contempt of the [TRO]" because of defendant's communication with Silva. Silva subsequently filed another complaint that same day, alleging that defendant purposely or knowingly disobeyed the TRO in violation of *N.J.S.A.* 2C:29–9b. As a result, the court ordered defendant's arrest.

After the hearing, the court issued a Domestic Violence Final Restraining Order (FRO). That Order was based on the testimo-

ny of both defendant and Silva concerning the incident that occurred in New York on April 27. The court's finding of an act of domestic violence was limited to that assault:

> I find that an assault has occurred. It occurred at approximately seven o'clock in the morning, and caused Ms. Silva to have to go to Somerville because of the domestic violence.

In her April 27 complaint, Silva indicated that the assault was not defendant's first act of domestic violence against her. Specifically, the complaint noted that "[p]laintiff states she has been hit in the face but cannot provide date." At the May 4 hearing, Silva testified that defendant "always is assaulting me.... He always is so violent with me." The following exchange occurred between the court and Silva:

> THE COURT: Has he ever hit you before [April 27], Ms. Reyes — Mrs. Silva?
>
> SILVA: Yes. A lot.

The court also raised the subject with defendant:

> THE COURT: Have you ever hit your wife?
>
> DEFENDANT: It was before, but now I haven't slap [sic] her, haven't hit my wife.

Defendant's response is ambiguous, but the use of "before" suggests prior violent conduct. However, although the court found that an assault occurred on April 27, it did not make any findings in respect of prior assaults.

On June 15, defendant pled guilty to violating the April 27, 2000 TRO. At the hearing, defendant admitted that he was aware of the order prohibiting him from contact with his wife and that he spoke with her in order to convince her to withdraw her complaint. As part of defendant's plea agreement, the court dismissed the charges based on the events of April 28 and 29. Defendant was sentenced to one year of probation and ordered to pay miscellaneous fines for the May 4 violation.

The Appellate Division reversed the entry of the FRO. We granted the State's petition for certification. 170 *N.J.* 386, 788

_A._2d 771 (2001).[1] We also granted the motions of Legal Services of New Jersey and the New Jersey Coalition for Battered Women for leave to appear as *amici curiae.*

## II

### A

The Legislature enacted the Domestic Violence Act "to assure victims of domestic violence the maximum protection from abuse the law can provide." *Sperling v. Teplitsky,* 294 *N.J.Super.* 312, 320, 683 *A.*2d 244 (Ch.Div.1996) ("[T]he Legislature, in adopting the [Act], sought to redress a perceived wrong."). Because it is remedial in nature, the Legislature directed that the Act be liberally construed to achieve its salutary purposes. *Young v. Schering Corp.,* 141 *N.J.* 16, 25, 660 *A.*2d 1153 (1995); see also *State v. Hoffman,* 149 *N.J.* 564, 584, 695 *A.*2d 236 (1997) ("Our law is particularly solicitous of victims of domestic violence[.]").

The Act defines domestic violence as the occurrence of one or more predicate offenses against a person protected under the Act. *N.J.S.A.* 2C:25–19. The Act sets forth fourteen predicate offenses, including assault, *N.J.S.A.* 2C:12–1, and harassment, *N.J.S.A.* 2C:33–4. Additionally, "the Act provides both emergency and long-term civil and criminal remedies and sanctions and encourages the 'broad application' of those remedies in the courts of this State." *Cesare v. Cesare,* 154 *N.J.* 394, 399, 713 *A.*2d 390 (1998) (citing *N.J.S.A.* 2C:25–18). Under *N.J.S.A.* 2C:25–28a, a victim alleging the commission of an act of domestic violence can file a complaint and seek emergency *ex parte* relief. *Id.* at 400, 713 *A.*2d 390. A plaintiff may apply for such relief

---

[1] For the first time in this appeal, defendant raises before this Court in a supplemental brief the issue of personal jurisdiction. Defendant's claim is without merit. Defendant appeared in New Jersey on several occasions to speak with Silva, appeared in court where he testified and where he pled, and was served with a copy of the TRO and the FRO.

in a court having jurisdiction over the place where the alleged act of domestic violence occurred, where the defendant resides, *or where the plaintiff resides or is sheltered,* and the court shall follow the same procedures applicable to other emergency applications.

[*N.J.S.A.* 2C:25–28a (emphasis added).]

Pursuant to that provision, courts will grant emergency, *ex parte* relief in the form of a TRO if "there is a showing that restraints are necessary to protect the life, health or well-being of a victim." *J.N. v. D.S.,* 300 *N.J.Super.* 647, 652, 693 *A.*2d 571 (Ch.Div.1996). If after conducting a hearing the court concludes that an act of domestic violence has occurred, the court may provide additional assistance to the victim. *N.J.S.A.* 2C:25–29b.

In *J.N., supra,* the Chancery Division considered whether a New Jersey court could issue an FRO "where the alleged act of domestic violence occurred in another State, but where the victim fled to New Jersey for shelter." 300 *N.J.Super.* at 649, 693 *A.*2d 571. The court noted that *N.J.S.A.* 2C:25–29a permits a court to consider "the existence of a verifiable order of protection from another jurisdiction." *Id.* at 650, 693 *A.*2d 571. The court further noted that according to the *State of New Jersey Domestic Violence Procedures Manual (Revised): September 1994,* issued under the authority of this Court and the Attorney General of this State, the existence of such an order provides "an adequate basis for the issuance of like restraints in New Jersey, without a need for alleging additional acts of violence." *Ibid.* (quotations omitted). The court further observed that

*N.J.S.A.* 2C:25–28a does not expressly mandate that the act of domestic violence must take place in New Jersey, nor does *N.J.S.A.* 2C:25–29a foreclose the victim from proving at a final hearing that an act of domestic violence was committed in another state where the victim has not sought or obtained an order of protection from another State.

[*Id.* at 650–51, 693 *A.*2d 571.]

The court recognized that "[domestic violence] must be addressed affirmatively by both law enforcement personnel and the courts, so that the victim and society are protected." *Id.* at 651, 693 *A.*2d 571. In that respect, the court observed:

> Were the court to deny jurisdiction in this case, the victim who seeks shelter in this state would be unprotected, unable to use the procedures established in this state which permit law enforcement officers and the courts to respond, promptly and effectively, to domestic violence cases. The victim would have to wait, in fear, for the alleged abuser to commit an additional act of domestic violence, this time in New Jersey, before having recourse to the law and to the courts of this state.
>
> [*Ibid.*]

The court thus concluded that New Jersey courts have jurisdiction to issue an FRO to a victim sheltered in New Jersey, even when the act of domestic violence occurred in another state. *Id.* at 652, 693 *A.*2d 571.

*Sperling, supra*, 294 *N.J.Super.* at 318, 683 *A.*2d 244, offers further guidance:

> Certainly domestic violence cannot be tolerated in any civilized society. Perhaps as the result of custom, practice, societal mores or other inappropriate reasons, in the past, victims of domestic violence were not adequately protected by the police, the courts, or society as a whole. Indeed, the Legislature found that thousands of persons in a domestic setting were victimized by acts of domestic violence on a yearly basis. Considering the underlying family dynamics along with competing pressures and issues existing in families, the Legislature determined more protection must be afforded victims of domestic violence. The Act was enacted, with the expressed intent that courts as well as law enforcement promptly and appropriately offer protection to victims of domestic violence. Indeed, victims of domestic violence are to be given the maximum protection from abuse the law can provide.
>
> (Citations and quotations omitted).

In *Pierson v. Pierson*, 147 *Misc.*2d 209, 555 *N.Y.S.*2d 227 (N.Y.Fam.Ct.1990), the defendant moved to dismiss the plaintiff's petition in Family Court alleging assault and harassment on the ground that the New York court lacked jurisdiction. *Id.* at 227–28. The court rejected the defendant's motion, reasoning that where the defendant was personally served with legal process in New York the court had subject matter jurisdiction of the domestic abuse proceeding "notwithstanding the fact that all the incidents occurred outside of New York." *Id.* at 227. In so holding, the court noted that "nothing in [the jurisdictional statute] limits the jurisdiction of Family Court to in-state assaults or harassment...." *Id.* at 228. The court also recognized that the defendant's presence in New York "continues the risk to [the plaintiff], and New York's interest in attempting to stop the violence, end

the family disruption and obtain protection—the purposes of [a domestic abuse] proceeding—is compelling." *Id.* at 229 (quotations omitted).

Federal law also addresses the question whether a domestic violence victim may obtain protection in a state other than that where the act of domestic violence occurred. 18 *U.S.C.A.* § 2261 to 2266. For example, 18 *U.S.C.A.* § 2265 provides that "[a]ny protection order issued ... by the court of one State ... shall be accorded full faith and credit by the court of another State...."

B

We also consider the public policy implications of the issue raised by this appeal.

"Domestic violence is a serious problem in our society." *Cesare, supra,* 154 *N.J.* at 397, 713 *A.*2d 390. Each year, three to four million women "from all socio-economic classes, races, and religions, are battered by husbands, partners, and boyfriends." *Id.* at 398, 713 *A.*2d 390. "The Act and its legislative history confirm that New Jersey has a strong policy against domestic violence." *Id.* at 400, 713 *A.*2d 390. Although New Jersey is "in the forefront of states that have sought to curb domestic violence," *Brennan v. Orban,* 145 *N.J.* 282, 299, 678 *A.*2d 667 (1996), New Jersey police reported 77,680 incidents of domestic violence in 2000 alone. *New Jersey Dep't of Law and Public Safety Uniform Crime Rep.* (2000).

Domestic violence rarely consists of an isolated event and often occurs both within and outside the home. It is a " 'pattern of abusive and controlling behavior injurious to its victims.' " *Cesare, supra,* 154 *N.J.* at 397, 713 *A.*2d 390 (quoting *Peranio v. Peranio,* 280 *N.J.Super.* 47, 52, 654 *A.*2d 495 (App.Div.1995)). Indeed, most female homicide victims are assaulted and killed in their own homes at the hands of male intimates. *State v. Gartland,* 149 *N.J.* 456, 468, 694 *A.*2d 564 (1997) (quoting Marina Angel, *Criminal Law and Women: Giving the Abused Woman Who Kills a Jury of Her Peers Who Appreciate Trifles,* 33 *Am.Crim. L.Rev.* 229, 320

(1996)). Given those stark realities, one can appreciate the plight of domestic violence victims who must flee their homes to escape their abusers.

However, once they have left their homes domestic violence victims are not out of danger and often must seek further shelter from abuse. "Domestic violence victims who leave their abusers are justified in their continued fear because of the many cases of victims who are assaulted or killed by former partners." *Hoffman, supra*, 149 *N.J.* at 585, 695 *A.2d* 236. Often victims are at greatest risk when they leave their abuser because the violence may escalate as the abuser attempts to prevent the victim's escape. Joan Zorza, "Protecting the Children in Custody Disputes When One Parent Abuses the Other," *Clearinghouse Review*, Vol. 29, No. 12 (April 1996). Many victims of domestic violence are afraid to leave their partners because of the response that their leaving might provoke in the abuser. *State v. Kelly*, 97 *N.J.* 178, 195, 478 *A.2d* 364 (1984).

Once a domestic violence victim has successfully escaped, the victim faces the continued risk of stalking and further abuse. U.S. Dep't of Justice, *Full Report of the Prevalence, Incidence, and Consequences of Violence Against Women* 10–11 (1998). This Court has recognized the numerous "[c]ase histories [ ] replete with instances in which a battered wife left her husband only to have him pursue her and subject her to an even more brutal attack." *Ibid.* Indeed, "[a]bused women are at the highest risk of being killed by their batterers during the time following separation." Jeanine Lewis, Comment, *The Hague Convention on the Civil Aspects of International Child Abduction: When Domestic Violence and Child Abuse Impact the Goal of Comity*, 13 *Transnat'l Law.* 391, 398 (2000).[2]

---

[2] These case histories illustrate the realities. For a fictional version of the problem, see *Black and Blue* (Random House 1998) by Anna Quindlen, in which a domestic violence victim leaves New York with her young son in order to escape an abusive spouse. The victim relocates to another state for shelter and her spouse pursues her.

## III

Against this factual, procedural, and public policy backdrop, we now address the substantive questions presented by this appeal.

■ Quite apart from whether defendant's conduct in New York alone was a basis for jurisdiction, his subsequent and separate harassment of Silva in New Jersey justifies the lower courts' assertion of jurisdiction.

### A

According to *N.J.S.A.* 2C:25–19a(13), harassment is a predicate offense under the Act. *N.J.S.A.* 2C:33–4, defines harassment as follows:

[A] person commits a petty disorderly persons offense if, with purpose to harass another, he [or she]:

a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, *or any other manner likely to cause annoyance or alarm;* ....

(Emphasis added).

■ After assaulting his wife in New York on the morning of April 27, defendant pursued her later that day to her sister's apartment in Somerville, New Jersey. Defendant repeatedly knocked on the door and rang the doorbell, demanded to speak with her, created a disturbance, and refused to leave. His conduct led to the summoning of the police, his wife's application for a TRO, and the issuance of a TRO. Defendant's actions in Somerville, when viewed in the context of his actions earlier that day—assaulting Silva in New York and following her to New Jersey—fall within the purview of our harassment statute because his actions were communications "likely to cause annoyance or alarm." *N.J.S.A.* 2C:33–4a.

The Appellate Division stated that "the subject of the complaint was the incident in New York, and not anything that occurred in Somerville later that evening." The allegations in Silva's complaint, however, focus on defendant's actions at her sister's house and not the incident in New York. Although the complaint refers

to the New York incident, it is primarily described as a foundation for the events that occurred later that day in New Jersey. Specifically, Silva stated in her complaint that

[d]efendant repeatedly banged on the victim's sister's house attempting to speak with the victim. Victim had fled to her sister's house earlier that evening because the defendant had struck her at their residence in New York.

■ We do not know the trial court's reasons for limiting its findings to the New York incident, given the facts alleged by Silva in her complaint. In any event, the trial court believed Silva's testimony concerning those events. Although the trial court's specific findings of fact related to the acts in New York, its determination that Silva's testimony was more credible than defendant's suggests that the court found Silva's entire testimony—including that relating to the events in Somerville—credible. Defendant neither objected to nor contradicted that testimony and does not now allege that any prejudice resulted to him from that testimony. Despite the trial court's failure to make a specific finding about defendant's conduct at the Somerville apartment on the evening of April 27, we conclude from the record that an act of domestic violence occurred in New Jersey. Additionally, defendant approached Silva on May 4 and asked her to withdraw the complaint. Silva subsequently filed a new complaint for violation of the TRO. Defendant's prohibited contact with Silva also constituted an act of harassment because it was "likely to cause annoyance."

Our review of defendant's conduct also leads us to conclude that but for defendant's conduct in New Jersey, it is unlikely that she would have sought relief from our courts. Silva did not seek a TRO until defendant tracked her down in Somerville and harassed her to the point that police intervention was sought. Accordingly, there are two communications that constituted harassment within the meaning of the Act—the disturbance created by defendant on April 27 in Somerville, and his improper contact with Silva on May 4, the morning of the TRO hearing. Those acts, considered either individually or in combination, vested jurisdiction in our courts to issue injunctive relief.

## B

 Our holding today would not change even in the absence of defendant's harassing conduct in New Jersey. The Act's plain language authorizes New Jersey courts to protect domestic violence victims seeking shelter in this State. *N.J.S.A.* 2C:25–28a. Silva was seeking both physical and legal shelter in New Jersey, *i.e.*, physical shelter with her sister and legal shelter from the courts. Because defendant pursued Silva after she sought refuge in New Jersey, our courts possess jurisdiction over defendant and had the concomitant power to issue injunctive relief against him pursuant to the Act.

 The Appellate Division held that the assault did not constitute an act of domestic violence within the meaning of the Act because it applied the jurisdictional limits of the Code of Criminal Justice, *N.J.S.A.* 2C:1–3 (Criminal Code), to the Act. Specifically, a person is guilty of assault under the Criminal Code only if the assault "occurs within this State." *N.J.S.A.* 2C:1–3a(1). Thus, the court concluded that "an assault occurring in New York is beyond the scope of the Act, and the New Jersey court lacked jurisdiction to issue a domestic violence restraining order based solely on that incident."

The Appellate Division erred in applying the general jurisdictional requirements for the prosecution of criminal offenses set forth in *N.J.S.A.* 2C:1–3, at the expense of the specific jurisdictional authorization found in the domestic violence statute, *N.J.S.A.* 2C:25–28a. Although the Act's fourteen predicate offenses derive from the Criminal Code, there is no indication that the Legislature intended to incorporate the Criminal Code's jurisdictional requirement. Rather, the Legislature declared that

> even though many of the existing criminal statues are applicable to acts of domestic violence, previous societal attitudes concerning domestic violence have affected the response of our law enforcement and judicial systems, resulting in these acts receiving different treatment from similar crimes when they occur in a domestic context. The Legislature finds that battered adults presently experience substantial difficulty in gaining access to protection from the judicial system[.]
>
> [*N.J.S.A.* 2C:25–18.]

The fourteen predicate offenses set forth in the statute define the acts that constitute domestic violence and do not import other sections of the Criminal Code. Defendant's reading of the statute ignores its clear mandate that an abused victim can apply for relief where he or she is sheltered. *N.J.S.A.* 2C:25–28 to –29. Any other interpretation ignores the Legislature's "encourage[ment of] the broad application of the remedies available under this act in the civil and criminal courts of the State." *N.J.S.A.* 2C:25–18.

The most that can be said for defendant's claim is that the Criminal Code applies to the Act but only as a limitation on criminal prosecutions. For example, the Act states that filing a civil complaint "shall not prevent the filing of a criminal complaint for the same act." *N.J.S.A.* 2C:25–28a, and that testimony in a domestic violence proceeding may not be used "in the simultaneous or subsequent criminal proceeding against the defendant," with the exception of contempt. *N.J.S.A.* 2C:25–29a. Those distinctions underscore the conclusion that criminal and civil statutes concerning domestic violence create separate rights and remedies. Thus, although defendant could not be prosecuted criminally in New Jersey because the assault occurred in New York, our Act provides twin avenues of relief encompassing both criminal and civil proceedings. Because this is not a criminal proceeding, the provisions of the Criminal Code do not limit the jurisdiction of our courts. *N.J.S.A.* 2C:25–19a, which lists the predicate offenses, defines domestic violence as the occurrence of one or more of the acts listed in the statute. Here, defendant committed the offense of harassment, one of the predicate offenses listed in the statute, in New Jersey.

## IV

█ The essential inquiry in this appeal is whether a victim of domestic abuse who seeks refuge in this State is entitled to the protections of the Act when the abuser enters the State and

commits an act of domestic violence in New Jersey.[3] The Act was designed to provide the maximum protection to victims of domestic violence that the law can provide. Indeed, in our mobile society victims of domestic violence deserve the fullest protection of the Act. In order to provide such comprehensive protection for those seeking shelter in our State, New Jersey courts must be able to issue restraining orders against abusers who pursue their victims in this State. We believe that the Legislature intended that the statute apply to such defendants. *Sperling, supra,* 294 *N.J.Super.* at 318, 683 *A.*2d 244. To do otherwise would undermine the remedial purposes of the Act and deprive victims of the statute's protections. Because Silva sought both physical and legal shelter in this State from further incidents of physical abuse at the hands of her husband, and because defendant pursued her and committed an act of domestic violence in this State, she deserves the maximum protection of our laws.

Reversed.

*For reversal*—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, and LaVECCHIA, and ZAZZALI—7.

*Opposed*—None.

---

[3] We are not presented with, and express no opinion on, the circumstances where an act of harassment occurs in another state and the abuser threatens to pursue the victim in New Jersey, but has not yet come into New Jersey, and the victim seeks a protective TRO to prevent contact in New Jersey.