799 A.2d 27 (2002)
351 N.J. Super. 512
A.R., Plaintiff-Respondent,
v.
M.R., Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued May 28, 2002.
Decided June 13, 2002.
*28 Charles J. Casale, Jr., Trenton, argued the cause for appellant (Casale and Popp, attorneys; Mr. Casale, of counsel and on the brief).
Linda M. Babecki, Trenton, argued the cause for respondent (Legal Aid Society of Mercer County, attorneys; Ms. Babecki, of counsel and on the brief).
Before Judges HAVEY, COBURN and WEISSBARD.
The opinion of the court was delivered by COBURN, J.A.D.
Plaintiff, accompanied by the three children of her marriage to defendant, fled from him in Mississippi, seeking refuge in New Jersey, after he severely beat her, threatened her life with a handgun, and swore that if she left him he would track her down and kill her and their children. When defendant began placing telephone calls to New Jersey in an effort to locate her and the children, plaintiff applied ex parte to the Chancery Division for a temporary restraining order pursuant to the Prevention of Domestic Violence Act of 1991, N.J.S.A. 2C:25-17 to -33 (the "Act"). The trial court found that an emergency restraining order was necessary to prevent the recurrence of domestic violence.
Thereafter, defendant, who did not appear but was represented by counsel, moved to dismiss the order, contending that the trial court lacked both subject matter jurisdiction, because he committed the violent acts in another state, and personal jurisdiction, because he had insufficient contacts with New Jersey. His motion was denied and the matter was scheduled for trial. Defendant did not appear at the trial; however, his attorney continued to maintain that the court lacked jurisdiction. A final restraining order was issued, and defendant appealed.
Ultimately, the sole issue presented to us was whether the trial court had personal jurisdiction over defendant. In other words, was it a violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution to apply the Act, for the purpose of protecting a victim who has fled here for safety, to a defendant who had committed acts of domestic violence against the victim in another state, coupled with threats to seek revenge against the victim wherever she went, and then had placed telephone calls to this state to discover her location. Our answer is no. Therefore, we affirm.

I
The parties met in New Jersey in 1985; the victim had been reared here and the defendant had lived here for about six years. Her sister resides in New Jersey, *29 as does his brother and three nieces. After the birth of their first child, they moved to Mississippi, where they were married in 1987, and where their other two children were born. In 1988 and 1989, the parties returned to live in New Jersey for short periods of time.
In Mississippi, defendant subjected plaintiff to various forms of mental and physical abuse throughout their marriage. He prevented her from having friends, severely twisted her arm on one occasion, insisted on leaving a handgun and bullets around the house in locations easily accessible to the children, and often forced her to engage in sexual acts that she considered "outside the norm." He also threatened to bring home college women "just so I could watch them in the act [of sexual intercourse] and so I could join in[,] and he was going to get a camcorder and record it to make his own videos."
Defendant's abusive conduct was also directed at the children. Plaintiff gave this description of a beating inflicted on one of the children when she was six years old:
He got ... a piece of limb and ... he beat her from one end of the house to the next[,] screaming[,] jumping on the furniture, bumping her head, bumping her back on furniture, hiding under the counter. He went and he flinged and overturned the bed after she tried to hide under the bed and he whip her some more. And I tried run and scream behind him and try to tell him to stop and he say you better the hell out of my way before I put this on you too.
She also indicated that defendant would beat this child "almost once a week." She added that the child, who is now fourteen years old, "still have gashes and marks all over her body. Each time he beat her like that, she had ... bleeding...."
Of another child, plaintiff said that when he was
at least 10 years old[,][h]e brought a D home in Math. I suggested to him that he may need some tutoring. He say he don't need no damn tutoring. He just lazy. So, he proceeded to go in and grab Junior out of his room like he do when he get them for a beating, snatch them up by the collar or by the pants and snatch them up. And when he got the extension cord out of the wall and doubled it and just use it and just beat him down through the house and when he ... try to escape or try to run to me, he just kept whipping him and chasing him through the house and the bathroom, under the beds, in the closets, all throughout the house. And whenever I try to go toward him or try to get him to stop or tell him that was enough, he just turn to me and say get the heck out of my way before II [w]ring your damn neck you don't get out my way.
Turning to her youngest child, plaintiff recounted that when the school called and told defendant that the child, then age seven, had been talking back to one of her teachers,
he ... got a leather belt ... and start to beat her through the house just like he do the other ones. And she's just a tiny little child and he just use all of his strength and just beat her all across her back, her legs, her face, everything. He didn't care where he hit her. He just hit her all over.
And there was nothing I could do but just stand to the side and watch and cry each time he do it because if I proceeded to tell him anything, he would threaten to kill me. And he said if you ever attempt to report this or if you ever attempt to tell even my mother about this ..., he threaten that if you ever try to leave or try to tell anybody, I'm going to kill you or I'm going to track you *30 down wherever you go and I'm going to kill you and the kids.

[Emphasis added.]
The events precipitating plaintiff's flight to New Jersey occurred on April 4, 2000. Without provocation, defendant jumped on plaintiff as she lay in their bed and pinned her down, pressing one of his knees into her lower back and the other into her stomach. Then, as she screamed for help, he yanked her hair, and repeatedly punched her face, neck, and jaw. Because she would not stop screaming, he reached under the bed, pulled out his loaded handgun, got back on top of her, held the gun to her temple and said, "`Shut up b-i-t-c-h or I'll blow your f-ing brains [ ] out all over this wall.'"
Moments later, plaintiff's brother entered the bedroom. Defendant hid his weapon, explained that they were just wrestling, and then sat on the bed to get her brother to leave. After her brother left, plaintiff picked up the telephone and began dialing 911. Defendant "snatched the phone out of [her] hand and ripped it out of the wall...." Shortly thereafter, plaintiff's brother went for the police, who came and arrested defendant. Plaintiff received emergency care at a hospital, returned home, and within hours fled with her children to her sister's home in New Jersey. She followed that course because she "fear[ed] for everybody[`s] life in there including his because he once told me if anything should happen, if I should ever try to leave him, he will kill the whole family and himself, too." (Emphasis added.)
On April 8, 2000, while plaintiff and her children were enjoying the refuge provided by her sister's home in New Jersey, defendant called in an effort to locate them. He thereafter made repeated calls for the same purpose.
On April 10, 2000, as a result of the fear engendered by one or more of defendant's telephone calls, plaintiff obtained the ex parte temporary restraining order, which included temporary custody of the children, on an emergent basis. On April 25, 2000, defendant obtained an ex parte order from a Mississippi court granting him emergency custody of the children.
On October 26, 2000, defendant filed a motion to dismiss plaintiff's temporary restraining order on the ground of lack of jurisdiction, arguing, in the alternative, that there was, at least, no jurisdiction for the child custody determination. On January 19, 2001, the trial court entered an order denying defendant's motion in all respects. The trial on plaintiff's request for a final restraining order was conducted in April and May, and judgment was entered in favor of plaintiff on May 16, 2001. On the subject of permanent custody, the trial judge noted that she had been in contact with the Mississippi judge and that their expectation was that they would be able to reach an agreement as to which state "shall exercise jurisdiction."

II
In State v. Reyes, 172 N.J. 154, 796 A.2d 879 (2002), which arose under the Act, the Court upheld the exercise of both subject matter and personal jurisdiction over a defendant who had committed an act of domestic violence in another state and then pursued the victim in New Jersey after she sought refuge here. Id. at 167-69, 796 A.2d 879. Unlike the situation at hand, however, Reyes involved a defendant whose pursuit involved physically entering this state. The Court noted that it was
not presented with, and expresses no opinion on, the circumstances where an act of harassment occurs in another state and the abuser threatens to pursue the victim in New Jersey, but has not yet come into New Jersey, and the victim seeks a protective TRO to prevent contact in New Jersey.

*31 [Id. at 169 n. 3, 796 A.2d 879.]
Since defendant committed his violent acts in Mississippi and told plaintiff that if she left with their children, he would track her down and kill all of them, wherever they might be, and thereafter made telephone calls to New Jersey that plaintiff reasonably feared were precursors of his arrival here, we are confronted by the issue that Reyes did not have to address.
We begin our analysis with the proposition that the public policy considerations underpinning the Act, as expressed in Reyes, id. at 162-65, 796 A.2d 879, would be ill-served by a failure to protect plaintiff simply because defendant has not yet physically arrived in New Jersey. Moreover, a denial of protection would be inconsistent with the Act itself since it expressly permits a victim of domestic violence, no matter where it occurs, to apply for relief wherever the victim "resides or is sheltered." N.J.S.A. 2C:25-28a. As Judge Zucker-Zarett poignantly observed in J.N. v. D.S., 300 N.J.Super. 647, 693 A.2d 571 (Ch.Div.1996), a case involving out-of-state acts of domestic violence:
Were the court to deny jurisdiction in this case, the victim who seeks shelter in this state would be unprotected, unable to use the procedures established in this state which permit law enforcement officers and the courts to respond, promptly and effectively, to domestic violence cases. The victim would have to wait, in fear, for the alleged abuser to commit an additional act of domestic violence, this time in New Jersey, before having recourse to the law and to the courts of this state.
[Id. at 651, 693 A.2d 571.]
We recognize, of course, that the judgment of a court lacking personal jurisdiction violates the Due Process Clause of the Fourteenth Amendment. Pennoyer v. Neff, 95 U.S. 714, 733, 24 L.Ed. 565, 572 (1877). However, a state court's assertion of personal jurisdiction does not violate due process if the defendant has "certain minimum contacts with it such that the maintenance of the suit does not offend `traditional notions of fair play and substantial justice.'" International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 102 (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278, 283 (1940)).
The evaluation of whether a defendant has the requisite minimum contacts with New Jersey is done on a case-by-case basis. Waste Management, Inc. v. Admiral Ins. Co., 138 N.J. 106, 122, 649 A.2d 379 (1994), cert. denied sub nom. WMX Technologies, Inc. v. Canadian General Ins. Co., 513 U.S. 1183, 115 S.Ct. 1175, 130 L.Ed.2d 1128 (1995). "The `minimum contacts' requirement is satisfied so long as the contacts resulted from the defendant's purposeful conduct and not the unilateral activities of the plaintiff." Lebel v. Everglades Marina, Inc., 115 N.J. 317, 323, 558 A.2d 1252 (1989). In short, the question is whether "`the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" Id. at 324, 558 A.2d 1252 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490, 501 (1980)).
In deciding whether defendant's conduct was such that he should have reasonably anticipated plaintiff's seeking our protection in New Jersey, we cannot lose sight of the purposes of the Act. This is no ordinary suit for money damages, but an action whose result may determine whether plaintiff and her children live or die. Had defendant only threatened in Mississippi to pursue the victim wherever she might go, we might have been obliged to find a lack of jurisdiction. But he went further: he repeatedly placed telephone calls into this state in his search for her.
*32 In Beckers v. Seck, 14 S.W.3d 139 (Mo. Ct.App.2000), plaintiff sought judicial protection from harassing telephone calls made to her by defendant from another state. The court held that it had personal jurisdiction, consonant with due process, over the defendant, observing in part:
There is little doubt appellant knew his harassing calls and mailings were purposefully being directed at respondent in Jackson County, MO. After all, he intentionally dialed Jackson County, MO, phone numbers and knowingly sent mail to Jackson County, MO, for no reason but to contact the respondent. "Jurisdiction is proper ... where the contacts proximately result from actions by the defendant himself that create a `substantial connection' with the forum State." Appellant's actions were directed at respondent, who resided and received messages and mail in Jackson County, MO. The location of appellant when making the calls or mailing the letters is irrelevant as the activity was directed at respondent in Jackson County, MO, with the establishment of jurisdiction over the person of the appellant, review in Jackson County was proper....
[Id. at 144 (citations omitted).]
Although the content of the telephone calls in the subject case could not be categorized as violations of the Act, in the context of the relationship between these parties, they could not have been placed without defendant's full awareness of their frightening effect on plaintiff in New Jersey. In light of the parties' historical and present connections to this state, the viciousness of the precipitating event, and the nature of the threats to exact revenge, the telephone calls were tantamount to defendant's physical pursuit of the victim here. Consequently, the trial court rightly exercised jurisdiction over this defendant. Cf. Reyes, supra, 172 N.J. at 167, 796 A.2d 879 Blakey v. Continental Airlines, Inc., 164 N.J. 38, 66-70, 751 A.2d 538 (2000).
Affirmed.