913 A.2d 791

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v.
VINCENT DISPOTO, A/K/A VINCENT R. DISPOTO,
JR., DEFENDANT–RESPONDENT.

Argued October 11, 2006—Decided January 18, 2007.

*Joseph P. Conner, Jr.,* Assistant Prosecutor, argued the cause for appellant (*Michael M. Rubbinaccio,* Morris County Prosecutor, attorney).

*Michael R. Ascher* argued the cause for respondent (*Einhorn, Harris, Ascher, Barbarito, Frost & Ironson,* attorneys).

*Johanna Barba Jones,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Stuart J. Rabner,* Attorney General, attorney).

*Joshua C. Gillette* argued the cause for *amicus curiae* Association of Criminal Defense Lawyers of New Jersey (*Kirkpatrick & Lockhart Nicholson Graham,* attorneys; *Mr. Gillette* and *Mark S. Morgan,* on the brief).

Justice LaVECCHIA delivered the opinion of the Court.

The State appeals from the affirmance of an order granting defendant Vincent Dispoto's motion to suppress an incriminating statement and other evidence gathered while law enforcement officials executed a domestic violence warrant to search for weapons. *State v. Dispoto*, 383 *N.J.Super.* 205, 891 *A*.2d 633 (App.Div.), *leave to appeal granted*, 186 *N.J.* 358, 895 *A*.2d 448 (2006). That statement and evidence had been used, in turn, to obtain a criminal warrant to search defendant's residence and office for narcotics. Defendant received *Miranda*[1] warnings at the time that the officers served him with the domestic violence search warrant at police headquarters. However, defendant was not re-*Mirandized* at the time he was placed under arrest, approximately one hour later, when he turned over an unlicensed gun to the police at his home. The Appellate Division held that the failure to re-administer *Miranda* warnings at the time of arrest required suppression of defendant's post-arrest incriminating statement, notwithstanding the pre-custodial warning about an hour earlier.

Two issues are advanced in this appeal. The issue that has drawn the parties' foremost attention is whether law enforcement officials must re-administer *Miranda* warnings to a suspect at the time of arrest even though the individual recently received such warnings during pre-custodial interactions with the officers. The second issue is whether the criminal search warrant in this matter was invalid.

We are convinced that there was insufficient evidence to support the issuance of the underlying domestic violence search warrant. Therefore, we hold that the criminal search warrant was invalid as fruit of the poisonous tree. Because our holding in regard to the domestic violence search warrant is dispositive of this matter, we add in respect of the issue of the *Miranda* warnings only that no bright line or *per se* rule governs whether re-administration is required following a pre-custodial *Miranda* warning. Courts are

---

[1] *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed*.2d 694 (1966).

to apply a totality of the circumstances analysis when determining whether re-administration of *Miranda* warnings is necessary.

## I.

### A.

Turning to the circumstances that generated the issuance of the domestic violence search warrant on April 25, 2001, we draw our facts from the record presented during the three-day suppression hearing conducted by the trial court. During the hearing, the court heard testimony about the facts and circumstances that had been presented to the municipal court judge who issued the domestic violence temporary restraining order and, later the same day, a domestic violence warrant to search for weapons.

On April 19, 2001, Detective Vincent Sheridan of the New Jersey State Police Narcotics and Organized Crime Bureau met with an informant, who had been brought to Sheridan's attention by a representative of the Mahattan District Attorney's Office. Sheridan testified that he had been told that the informant possessed information about suspected criminal activities by defendant; however, Sheridan was not told whether or how the District Attorney's Office knew the informant to be reliable. Sheridan himself had not worked with the informant before and otherwise knew nothing about the informant or his reliability. The informant told Sheridan that defendant was associated with organized crime, was diverting money into offshore accounts, and was dealing narcotics to supplement his income. The informant also said that defendant, who was involved in a divorce proceeding, had asked the informant whether he knew "anybody who would kill his (defendant's) wife."

Sheridan did not have any information at the time to support the informant's various allegations. In respect of the alleged threat concerning defendant's wife, Jacqueline, Sheridan did not take any immediate steps to contact and inform her that she might be in danger. Apart from running a computer criminal back-

ground check on defendant, Sheridan testified that there was no attempt to corroborate, through independent investigation, the information provided by the informant. Instead, Sheridan asked the informant to arrange a meeting with defendant in which the informant could wear a recording device to tape the conversation with defendant.

On April 25, 2001, six days after Sheridan first met with the informant, the informant met with defendant as requested. The record reveals that the tape in the recording device that the informant was wearing ran out before the informant engaged defendant in any discussion about his previous alleged statement, namely, that he wanted to have someone kill his wife. Later, when the informant was being debriefed, he told Sheridan that defendant had denied wanting to have his wife killed. Indeed, defendant had expressed a lack of concern about his estranged wife and had stated that he would not attempt to have her killed because if anything happened to his wife he would become the primary suspect.

On review of the information gathered through the informant's meeting with defendant, Sheridan's supervising sergeant concluded that there was insufficient evidence to pursue a murder-for-hire investigation against defendant.[2] However, pursuant to advice provided by an attorney with the Office of the Attorney General, Division of Criminal Justice, the sergeant directed Sheridan to notify Jacqueline Dispoto that they had received uncorroborated information that she was in danger.

---

[2] Throughout the initial suppression hearing, the prosecutor referred to the State Police Narcotics and Organized Crime Bureau's interest in defendant as a "murder-for-hire" investigation. The evidence in the record supports a broader intention, however; in respect of the criminal investigation against defendant. On cross-examination during the *Miranda* hearing, Sheridan's supervising sergeant conceded a law enforcement investigatory interest in information that defendant was engaged in illicit activities involving organized crime, misappropriation of funds, and narcotics distribution.

That afternoon, on April 25, 2001, Sheridan and two other State Police detectives drove to Jacqueline's residence in Morris Plains, New Jersey. At the time, Jacqueline had been separated, but not divorced, from defendant for two-and-a-half years. According to Sheridan, he told Jacqueline that he had information that defendant was attempting to hire someone to kill her. According to Jacqueline, who also testified at the suppression hearing, Sheridan did not inform her that the information was "uncorroborated." Nor did he inform her about the exculpatory statements defendant had made to the informant earlier that day.

After hearing that her husband intended to have her killed, Jacqueline Dispoto became very upset. She told the detectives that she believed that defendant would attempt to hire someone to kill her because she previously had obtained two temporary restraining orders against defendant (both of which had been withdrawn). Sheridan encouraged Jacqueline to accompany the State Police detectives to the Morris Plains Police Department to seek a temporary restraining order against defendant, and she agreed. According to Jacqueline's testimony, however, she did not understand at the time why the detectives insisted that she obtain a domestic violence restraining order against defendant, rather than arresting defendant themselves if they believed that he was soliciting people to kill her.

After arriving at the Morris Plains police headquarters, Sheridan contacted Municipal Court Judge Gary Troxell to obtain a temporary restraining order against defendant. Judge Troxell, who also testified at the suppression hearing, stated that he found it odd that a detective from the New Jersey State Police Narcotics and Organized Crime Bureau was contacting him on a domestic violence complaint. After speaking with Detective Sheridan and Jacqueline Dispoto over the telephone, Judge Troxell authorized a temporary restraining order and inquired whether Sheridan was applying also for a domestic violence search warrant for weapons. Sheridan informed the court that he needed to consult with the Morris County Prosecutor's Office.

Later that evening, Sheridan telephoned Judge Troxell to request the domestic violence search warrant. Under oath, Sheridan testified that he had met with a confidential informant on April 19, 2001, and that the informant told Sheridan that defendant kept all his money in offshore accounts, was associated with organized crime, wanted to have his wife killed to preserve his wealth, supplemented his income by selling marijuana, and owned an unregistered weapon. Sheridan informed Judge Troxell that he believed the informant to be reliable, but did not tell the court that the State Police had not used this informant before. Sheridan also testified that the detectives had contacted Jacqueline Dispoto about "the circumstances regarding her safety," and he told the court that Jacqueline believed "the threat to be credible" because of two previous incidents of domestic violence. Accordingly, Sheridan requested issuance of a search warrant to locate any weapons defendant might have. Judge Troxell issued a warrant permitting a search of defendant's residence and office for weapons.

### B.

The events involving the execution of the domestic violence search warrant, which give rise to the *Miranda* issue in this case, were succinctly recounted by the Appellate Division.

In the early evening of April 25, 2001, at approximately 8:20 p.m., defendant was taken to the Morris Plains Police Department to be served with the TRO and search warrant for weapons. Shortly after 9:30 p.m., although not under arrest, defendant was given his *Miranda* warnings, after which he signed the *Miranda* form. Defendant was then taken to his office accompanied by police who executed the search warrant. The police found marijuana in an employee's desk located in a cubicle. After finding the marijuana, the police secured the area pending application for a criminal search warrant. Defendant was still not placed under arrest.

At approximately 10:40 p.m., the police drove defendant to his residence. After entering his home with the officers, defendant took them upstairs and surrendered his Colt .38 revolver. After advising the police that he won the revolver in a poker game, the defendant was arrested for improper acquisition of a handgun. The police continued the weapons search, checked the pool cabana and then the garage. According to one of the officers, when they arrived at the garage, defendant went from a "George Hamilton tan to a Bella [sic] Lugosi gray." After some initial resistance, defendant provided the police with the code and they opened the garage

door via an electronic key pad. A locked safe was found inside the garage. The police claimed that they could smell a strong odor of marijuana coming from the safe. As they entered the garage, the police asked defendant what was in the safe. Defendant essentially responded that there were two pounds of marijuana. The police then stopped the search and secured the scene pending the application for a search warrant. Defendant was handcuffed and taken to headquarters.

An application for a search warrant to search the garage for CDS and drug paraphernalia was filed the following day with the Presiding Judge of the Criminal Division (Presiding Judge). In an affidavit in support of the application, Sheridan provided the background information. The information provided was essentially the same as set forth above. It, however, left out factual information as to when defendant was arrested. It explained what was provided by the informant and defendant's wife respecting defendant's drug activity and stated that defendant was "read rights as per Miranda" while he was at police headquarters. It did not disclose that defendant was not under arrest when he was served with the TRO and weapons search warrant. The criminal search warrant issued and the police opened the safe and seized the contraband contained inside.

[*Dispoto, supra,* 383 *N.J.Super.* at 211–12, 891 *A.*2d 633 (footnotes omitted).]

## C.

On October 10, 2001, a grand jury issued a three-count indictment against defendant. Count One of the indictment charged defendant with second-degree possession of a controlled dangerous substance with intent to distribute, *N.J.S.A.* 2C:35–5a, while in possession of a weapon, *N.J.S.A.* 2C:39–4.1. Count Two of the indictment charged defendant with third-degree possession of a controlled dangerous substance with intent to distribute, *N.J.S.A.* 2C:35–5a(1). Count Three charged defendant with fourth-degree possession of a controlled dangerous substance, *N.J.S.A.* 2C:35–10a(3).

Defendant moved to dismiss the indictment and to suppress the .38 caliber pistol, the marijuana, and the drug paraphernalia. He contended that probable cause did not exist to justify either the initial domestic violence search warrant or the subsequent criminal search warrant.

Following a three-day hearing, the trial court granted defendant's motion to suppress the pistol. Citing *State v. Perkins,* 358 *N.J.Super.* 151, 817 *A.*2d 364 (App.Div.2003), the court held that the gun was inadmissible because weapons obtained pursuant to a

domestic violence search warrant generally may not be admitted in a subsequent criminal proceeding. However, defendant's motion to suppress the marijuana and the drug paraphernalia was denied.

Defendant thereafter moved to suppress his post-arrest statements, asserting that the law enforcement officials had obtained those statements in violation of *Miranda.* On May 24, 2005, after eleven days of hearing, the court suppressed defendant's post-arrest statements and, reversing its previous determination, suppressed the marijuana and the drug paraphernalia seized pursuant to the criminal search warrant.

In respect of the post-arrest statements, the court found that defendant was not in police custody when the *Miranda* warnings first were administered and, therefore, defendant was denied his *Miranda* protections when the warnings were not re-administered at the time he was arrested for possessing a weapon without a permit. In respect of the court's prior order denying defendant's motion to suppress the marijuana and the drug paraphernalia, the court reversed its earlier determination based on the failure of the law enforcement officials' application for the warrant to include information about the timing of the *Miranda* warning and defendant's arrest. The court reasoned that that information would have affected the issuing court's determination whether to grant the criminal search warrant. Further, the court commented on the improbability of the law enforcement officials' ability to have smelled the odor of marijuana coming from inside a safe in defendant's garage, stating that it was more likely that the officials simply detected the musty odor of the plant fertilizer, soil, and garden materials that were inside the garage. Thus, the court concluded that the search warrant process was so tainted by the improper inclusion of incriminating statements and the mistaken mention of a marijuana odor that the fruits of the search had to be suppressed.

The Appellate Division granted the State's motion for leave to appeal and affirmed the order. *Dispoto, supra,* 383 *N.J.Super.* at

209, 891 *A*.2d 633. The panel agreed that defendant's post-arrest statements should be suppressed because *Miranda* warnings were not re-administered to defendant when he was placed under arrest. Commenting on the effectiveness of pre-custodial *Miranda* warnings, the panel noted that "[w]arnings previously given under circumstances that did not amount to either custodial interrogation or formal arrest did not vitiate the need to give the warnings again when required." *Id.* at 214–15, 891 *A*.2d 633. The panel also upheld the suppression of the marijuana and drug paraphernalia as fruits of the poisonous tree. The panel concluded that "there was sufficient credible evidence for the judge to disregard the officers' claims that they smelled marijuana and find that the only probable cause relied upon by the police in obtaining the search warrant, which resulted in the seizure of the contraband, was defendant's suppressed admission." *Id.* at 218, 891 *A*.2d 633.

## II.

The New Jersey Prevention of Domestic Violence Act (NJPDVA), *N.J.S.A.* 2C:25–17 to –33, gives relief to individuals who have been abused by their spouses, cohabitants, and family members. *N.J.S.A.* 2C:25–18; 2C:25–19 (listing fourteen offenses, any one of which, if violated, constitutes an act of domestic violence). To achieve its goals, the NJPDVA authorizes courts to issue restraining orders to assure the safety of domestic violence victims. *State v. Cassidy,* 179 *N.J.* 150, 157, 843 *A*.2d 1132 (2004).

The NJPDVA permits a victim of domestic violence to file a complaint against an abuser and to seek emergency ex parte relief. *See N.J.S.A.* 2C:25–28a, –28f; *Cesare v. Cesare,* 154 *N.J.* 394, 400, 713 *A*.2d 390 (1998). The victim can request a temporary restraining order, which a court may issue against the abuser "when necessary to protect the life, health or well-being of a victim." *N.J.S.A.* 2C:25–28f. In addition, the NJPDVA permits the issuance of a civil warrant to search for weapons that the abuser could use to cause further and potentially fatal harm to the

victim. *See N.J.S.A.* 2C:25–28j; *Cassidy, supra,* 179 *N.J.* at 163, 843 *A.*2d 1132 ("The Act recognizes that, in certain circumstances, removal of weapons will be necessary to protect a victim."). Thus, a court may order "the search for and seizure of any [firearm or other weapon enumerated in subsection r of *N.J.S.A.* 2C:39–1] at any location where the judge has reasonable cause to believe the weapon is located." *N.J.S.A.* 2C:25–28j.

⬛ Moreover, the NJPDVA authorizes expeditious and efficient implementation of its goal to protect domestic abuse victims. When a court determines that "exigent circumstances exist sufficient to excuse the failure of the [victim] to appear personally and that sufficient grounds for granting the application have been shown," the victim may apply telephonically for the temporary restraining order and accompanying search warrant. *Cassidy, supra,* 179 *N.J.* at 158, 843 *A.*2d 1132 (quoting *N.J.S.A.* 2C:25–28h). That said, the remedial protections afforded under NJPDVA are intended for the benefit of victims of domestic violence and are not meant to serve as a pretext for obtaining information to advance a criminal investigation against an alleged abuser.

⬛ The temporary restraining order's purpose is to provide the domestic violence victim with a buffer zone of safety and shield the victim from the risk of contact with an abuser. *See State v. Reyes,* 172 *N.J.* 154, 169, 796 *A.*2d 879 (2002). Similarly, the purpose of a domestic violence search warrant "is to protect a victim of domestic violence from further violence, not to discover evidence of criminality." *Perkins, supra,* 358 *N.J.Super.* at 161, 817 *A.*2d 364. Accordingly, before a domestic violence temporary restraining order and accompanying search warrant can be issued, the court must find probable cause to believe that an offense of domestic violence has occurred. *See Cassidy, supra,* 179 *N.J.* at 164, 843 *A.*2d 1132. If the record of an ex parte proceeding does not disclose "a proper basis for a finding of exigency for the telephonic application, probable cause to believe that the offense of domestic violence has occurred, and a reason to permit a search

for weapons in a location removed from the place where the domestic violence allegedly occurred," the search warrant is invalid. *Ibid.*[3] In the absence of an exception to the warrant requirement, "evidence seized pursuant to a defectively authorized search warrant" is inadmissible in a subsequent criminal prosecution. *Id.* at 159, 843 *A.*2d 1132.

Thus, to obtain the protections afforded under the NJPDVA, a victim must demonstrate that the alleged abuser committed an act of domestic violence. The NJPDVA "incorporates a variety of criminal statutes" to determine what constitutes domestic violence. *Cesare, supra,* 154 *N.J.* at 401, 713 *A.*2d 390. For present purposes,[4] it is sufficient to note that the NJPDVA specifically defines "domestic violence" as

the occurrence of one or more of the following acts inflicted upon a person protected under this act by an adult or an emancipated minor:

. . .

(3) Terroristic threats N.J.S. 2C:12–3.
[*N.J.S.A.* 2C:25–19a.]

An individual commits the third-degree crime of terroristic threats if he or she "threatens to kill another with the purpose to put [the other] in imminent fear of death under circumstances reasonably causing the victim to believe the immediacy of the threat and the likelihood that it will be carried out." *N.J.S.A.* 2C:12–3b. In the domestic violence context, an act of terroristic threats requires that (1) the abuser threatened the victim; (2) the abuser intended to threaten the victim; and (3) "a reasonable

---

[3] In *State v. Johnson,* 352 *N.J.Super.* 15, 19–20, 39, 799 *A.*2d 608 (App.Div. 2002), the Appellate Division stated that a domestic violence search warrant can issue pursuant to *N.J.S.A.* 2C:25–28j based on a finding of "reasonable cause" to believe that the abuser has committed an act of domestic violence. To the extent that *Johnson's* domestic violence search warrant standard is inconsistent with the Court's decision in *Cassidy, supra,* 179 *N.J.* at 164, 843 *A.*2d 1132, *Johnson* is disapproved.

[4] The application for the domestic violence search warrant in this matter was premised on the allegation that defendant committed the domestic violence act of making terroristic threats.

person would have believed the threat." *Cesare, supra,* 154 *N.J.* at 402, 713 *A.*2d 390. The abuser, however, does not have to communicate the threat directly to the victim for the threat to be actionable. *Id.* at 403, 713 *A.*2d 390. Rather, it is sufficient that "the threat be made under circumstances under which it carries the serious promise of death." *Ibid.* (quoting *State v. Nolan,* 205 *N.J.Super.* 1, 4, 500 *A.*2d 1 (App.Div.1985)). Proof of the alleged terroristic threat is measured by an objective standard. *Id.* at 402, 713 *A.*2d 390.

### III.

To sustain the validity of the domestic violence search warrant that issued against defendant, probable cause must have existed to believe that defendant committed the offense of terroristic threats. Specifically, there must have been probable cause to believe that defendant made a threat against his wife. The sole support for that element of the offense was provided by the assertion (later contradicted) of a confidential informant of unknown reliability and whose source of knowledge was never placed before the magistrate who issued the warrant. Moreover, when asked to provide support for the earlier allegation, the informant could not produce a taped statement by defendant substantiating his alleged earlier interest in finding someone to kill his wife, nor did the informant relate any similar statement made by the defendant during that assignation. Instead, the informant relayed a contradictory expression of intent by defendant. The informant's statement fails to provide evidence to support a finding of probable cause that a threat was made.

The State urges that we view the alleged 2001 threat as "freshening up" two earlier threats that defendant allegedly made against his wife in 1998 and 2000. The informant's statement is too flimsy to be used for such a purpose. No renewed threat was uttered by defendant to his wife. She sought the 2001 temporary restraining order in reaction to the information that the State Police officers relayed to her. The information that was conveyed

was incomplete, however, and as a result was capable of misleading her and ultimately, through her and her reaction to it, the magistrate.

Plainly, the information as it was relayed to Jacqueline Dispoto provoked a strong reaction in her. The personal reaction of the alleged victim, however, is not the measure of proof of a terroristic threat. *See Cesare, supra,* 154 *N.J.* at 403, 713 *A.*2d 390. The crime of terroristic threats "requires that the threat be made under circumstances under which it carries the serious promise of death." *Nolan, supra,* 205 *N.J.Super.* at 4, 500 *A.*2d 1. There is no such evidence here. Moreover, permeating the series of events that transpired is the sense that the domestic violence search warrant was being used by law enforcement representatives to uncover evidence of criminal behavior unrelated to defendant's alleged acts of domestic violence.

Thus, although there is in this record no apparent harm that was visited on defendant as a result of the immediate protective temporary restraining order thrown around Jacqueline, the invalid domestic violence search warrant with which defendant rightfully complied at the time [5] may not be used as a bootstrap mechanism to obtain evidence to sustain issuance of a criminal search warrant. The evidence that was produced through defendant's compliance with the domestic violence search warrant consequently constituted fruits of the poisonous tree and must be suppressed. *See Wong Sun v. United States,* 371 *U.S.* 471, 484–85, 83 *S.Ct.* 407, 416, 9 *L.Ed.*2d 441, 453–54 (1963).

## IV.

Although we affirm, for different reasons, the judgment of the Appellate Division that affirmed the trial court's order of suppres-

---

[5] *See Cassidy, supra,* 179 *N.J.* at 165, 843 *A.*2d 1132 (encouraging immediate and prompt compliance with domestic violence warrant, although reserving opportunity to challenge warrant's validity).

sion, we add the following in respect of the panel's decision. When addressing the effectiveness of the pre-custodial *Miranda* warnings in this case, the Appellate Division commented that "[w]arnings previously given under circumstances that did not amount to either custodial interrogation or formal arrest did not vitiate the need to give the warnings again when required." *Dispoto, supra,* 383 *N.J.Super.* at 214–15, 891 *A.*2d 633. The Appellate Division's statement can be read to suggest that pre-custodial *Miranda* warnings are *per se* ineffective and must be re-administered at the time of arrest under all circumstances in order to obtain a valid waiver of rights. Our invalidation of the domestic violence search warrant issued here renders moot the Appellate Division's holding about the validity of defendant's waiver of rights. That said, we note that the Appellate Division's standard has never been applied heretofore in this State. We reject that bright-line approach and retain instead the more measured and traditional standard that allows for a totality-of-the-circumstances assessment.

Several of our sister states have addressed whether pre-custodial *Miranda* waivers are *per se* ineffective and all but one have eschewed a bright-line approach. *See, e.g., Upton v. State,* 343 *Ark.* 543, 36 *S.W.*3d 740, 743–44 (2001) (conducting fact-sensitive analysis to determine sufficiency of pre-custodial warnings); *State v. Burge,* 195 *Conn.* 232, 487 *A.*2d 532, 543 (1985) (same); *Commonwealth v. Colby,* 422 *Mass.* 414, 663 *N.E.*2d 808, 810 (1996) (same); *State v. Monroe,* 142 *N.H.* 857, 711 *A.*2d 878, 886–87 (1998) (same), *cert. denied,* 525 *U.S.* 1073, 119 *S.Ct.* 807, 142 *L.Ed.*2d 667 (1999); *State v. Rupe,* 101 *Wash.*2d 664, 683 *P.*2d 571, 581 n. 4 (1984) (same). *But see State v. Bradshaw,* 193 *W.Va.* 519, 457 *S.E.*2d 456, 467 (holding that pre-custodial *Miranda* warnings are *per se* ineffective), *cert. denied,* 516 *U.S.* 872, 116 *S.Ct.* 196, 133 *L.Ed.*2d 131 (1995). A totality-of-the-circumstances approach is preferable in that it encourages warnings when police question a suspect and allows law enforcement officials to pursue their investigations, subject to later review by a neutral court. Thus when, as here, pre-custodial warnings have been given to a

defendant as part of a continuing pattern of interactions between the defendant and the police, and during that continuing sequence of events nothing of an intervening nature occurs that would dilute the effectiveness of the warning that had been given, then there would appear to be no need to require that another warning be given. Such determinations are better suited to fact-based assessments rather than being made subject to bright-line pronouncements.

## V.

The judgment of the Appellate Division is affirmed as modified by this opinion.

*Affirm as Modified*—Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—6.

*Opposed*—None.