899 A.2d 1052 (2006)
386 N.J. Super. 233
STATE of New Jersey, Plaintiff-Respondent,
v.
Keon MILLEDGE, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued May 8, 2006.
Decided June 15, 2006.
*1053 Stephen W. Kirsch, Assistant Deputy Public Defender argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Mr. Kirsch, of counsel and on the brief).
Johanna Barba Jones, Deputy Attorney General, argued the cause for respondent (Zulima V. Farber, Attorney General, attorney; Ms. Jones, of counsel and on the brief).
Before Judges CUFF, LINTNER and GILROY.[1]
The opinion of the court was delivered by
LINTNER, J.A.D.
A Cumberland County Grand Jury returned a multi-count indictment charging defendant, Keon Milledge, and three co-defendants, Lamar Milbourne, Michael Hinson, and Davon Nichols with various offenses against two victims, K.M. and C.P. Milledge was transferred to the Criminal Part, N.J.S.A. 2A:4A-26, without objection, to be tried as an adult. Following a jury trial, defendant was convicted of two counts of first-degree aggravated sexual assault of K.M., N.J.S.A. 2C:14-2a, along with first-degree kidnapping, N.J.S.A. 2C:13-1b, third-degree criminal restraint, N.J.S.A. 2C:13-2a, second-degree robbery, N.J.S.A. 2C:15-1a, and simple assault, N.J.S.A. 2C:12-1a, of both K.M. and C.P. He was also found guilty of second-degree conspiracy to commit robbery, N.J.S.A. *1054 2C:15-1a(1), and fourth-degree aggravated assault upon Sergeant Carl Crispin, N.J.S.A. 2C:12-1b(5)(a). Defendant was acquitted of second-degree aggravated assault of K.M. and C.P., N.J.S.A. 2C:12-1b(1), third-degree terrorist threats of both victims, N.J.S.A. 2C:12-3b, and possession of a baseball bat for an unlawful purpose, N.J.S.A. 2C:39-4d.
The judge denied defendant's motion for new trial. Following appropriate mergers, the judge imposed an aggregate sentence of thirty-four years with 85% parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2, consisting of two twenty-year terms with 85% parole ineligibility on the kidnapping convictions, concurrent seventeen-year terms with 85% parole ineligibility on the merged aggravated sexual assault convictions, seven-year terms with 85% parole ineligibility on each of the two robbery convictions to be served consecutively with each other and the terms imposed on the aggravated sexual assault and kidnapping convictions. Concurrent six-month terms were imposed on the simple assault convictions and a concurrent eighteen-month term was imposed on the aggravated assault conviction. Included in the appropriate fines and penalties were three $800 penalties to be deposited in the Sexual Assault Nurse Examiner (SANE) Program Fund, N.J.S.A. 2C:43-3.6. We affirm the convictions, but remand for resentencing on the merged aggravated sexual assault convictions.
The State established the following facts at trial. On September 19, 2002, at approximately 9:30 p.m., K.M. and C.P. were sitting in K.M.'s car. The four perpetrators drove up and approached K.M.'s car. Claiming to be a policeman, Milbourne, who was wearing an orange T-shirt, opened K.M.'s door, grabbed a cell phone from K.M. and passed it to defendant who was wearing an Old Navy T-shirt. Milbourne then punched C.P. in the face and pulled K.M. out of the car. Milbourne placed K.M. face down against the trunk of her car, and took her keys and wallet, which he handed to defendant. Milbourne also took K.M.'s watch off of her wrist.
Milbourne lifted K.M.'s T-shirt and began touching her breasts. He ordered K.M. to spread her legs. When she resisted he punched her in the ribs. Defendant stood nearby. One of the other perpetrators, one with big hands, also punched her in the ribs. Milbourne pried K.M.'s legs apart and pulled down her panties. He then digitally penetrated her. Defendant then took his turn putting his fingers into her vagina, calling her a "white bitch" and making other derogatory comments. C.P. overheard defendant's comments and believed he recognized defendant's voice because he had known him since elementary school and had spoken to him three or four days before the incident.
While Milbourne was holding K.M.'s hair, defendant grabbed her by the ankles, pulled her to the ground, dragged her away from the car, and forced her to have intercourse with him. At some point, K.M. screamed, "God help me," to which defendant replied, "God can't help you now."
Meanwhile, two other members of the gang, Nichols and Hinson, prevented C.P. from getting out of the car. They each went to the side of the car from time to time and hit C.P. in the face. C.P. recognized Hinson from high school and at one point said, "you," to which Hinson paused and then asked C.P. if he knew him. C.P. responded "no." Hinson left and returned with a baseball bat, which he used to strike C.P.'s hands after ordering C.P. to place his hands on the dashboard. Hinson took C.P.'s wallet containing thirty-one dollars and his cigarettes and lighter.
After the forced intercourse, K.M. attempted to feign unconsciousness. Defendant grabbed her, however, and started *1055 punching her. When she faked waking up, he told her if she screamed he would kill her. She was then forced onto her knees and was made to perform oral sex on the four perpetrators. Defendant told her if she bit him, he would kill her. At one point, Hinson placed a baseball bat against C.P.'s face turning C.P.'s head and forcing him to watch K.M. perform forced oral sex on defendant and others. He heard K.M. begging them to stop, however, they just responded by smacking her and yelling obscenities. Eventually, he saw K.M. go limp or unconscious.
As the perpetrators had their way with K.M., they took turns monitoring C.P. to be sure he did not leave his car. When it was defendant's turn to restrain C.P., he hit C.P. in the face, chest, and arms. Defendant eventually pulled C.P. from the car and continued to hit him. The rest of the gang returned and Hinson hit C.P. across the legs with a baseball bat causing him to fall to the ground, whereupon they all stomped and kicked him while he was face down on the ground.
Toward the end of the attack, after K.M. was forced to have oral sex with all the perpetrators, defendant stood K.M. up and told her to walk twenty paces into the woods. As she turned around, Milbourne said, "No, she's not doing that. She's not running away." She was then left with the perpetrator who was not wearing a T-shirt who pushed her to the ground and asked for her name and address. K.M. responded, supplying a fake name and address. The perpetrator told her, "We'll come get you" and then walked away. As K.M. lay on the ground, an unidentified perpetrator came up behind her and punched her in the face. According to K.M., the attack on her and C.P. lasted for "probably a half hour, but it felt like it lasted forever."
After the gang left, K.M. went back to the car where she found C.P., bleeding from the face. C.P. described them both as being "pretty beat up." Wearing just her right shoe and a T-shirt, K.M. found her other shoe, grabbed a spare key that she had in the glove compartment, and drove to the hospital.
K.M. suffered vaginal bleeding, anal abrasions, a black right eye, bruising, cuts, and scrapes on much of her body and abrasions inside her mouth. C.P. had bruises, scrapes, and cuts to his face, arms, and legs. Defendant's latent palm prints were taken from the rear passenger window of K.M.'s car. A baseball bat was found in the trunk of Hinson's car. Defendant's recorded statement given to Detective Rick Pierce of the Bridgeton Police Department was played to the jury.
Defendant raises the following points on appeal:
POINT I
THE DEFENDANT'S STATEMENT TO POLICE SHOULD HAVE BEEN SUPPRESSED BECAUSE HE WAS NOT READ HIS RIGHTS WHILE HE WAS IN CUSTODY; ADDITIONALLY, THE DEFENDANT'S SHOVING OF A POLICE OFFICER IN RESPONSE TO A QUESTION, FOLLOWED BY HIS ARREST AND HANDCUFFING, WAS AN ASSERTION OF THE RIGHT TO SILENCE WHICH HAD TO BE FOLLOWED BY MIRANDA WARNINGS BEFORE INTERROGATION COULD RESUME.
POINT II
THE CRIME OF KIDNAPPING OF THE FEMALE VICTIM WAS UNSUPPORTED BY SUFFICIENT EVIDENCE BECAUSE THE CONFINEMENT WAS INCIDENTAL TO THE OTHER CRIMES; ADDITIONALLY THE JURY INSTRUCTIONS FOR BOTH KIDNAPPINGS WERE DEFICIENT. (PARTIALLY RAISED BELOW).

*1056 A) Sufficiency of the evidence of kidnapping of K.M.
B) Jury instruction error applicable to both Kidnappings.
C) Jury instruction error applicable only to The kidnapping of the male victim.
POINT III
THE SENTENCE IMPOSED IS MANIFESTLY EXCESSIVE.
POINT IV
TWO OF THE SEXUAL ASSAULT NURSE EXAMINER FEES SHOULD BE VACATED.
The following facts were established at a Miranda hearing held at the beginning of the trial. Bridgeton Detective Domenic Patitucci and two other detectives went to defendant's residence looking for defendant, but he was not home. They told his mother that they wanted him to come to City Hall with reference to an incident that had occurred earlier that night. They explained to defendant's mother what they knew had occurred up to that point. They then left and went to another suspect's home. Later that day, Patitucci received a phone call from defendant, indicating that he wanted to go to City Hall. Defendant arrived with his mother about eight to ten minutes later. Patitucci took them to the investigation room in the basement. He read defendant his Miranda[2] rights and both defendant and his mother initialed and signed the waiver of rights form. Immediately thereafter, defendant's mother told Patitucci that she was leaving and going to her car.
Patitucci, who knew defendant and his mother for sometime, described defendant as calm. Defendant told him that he had heard that some of his friends were "out robbing Mexicans" and that he had a list of names who could verify that he was somewhere else at the time. He did not give Patitucci the list.
Shortly thereafter, Sergeant Carl Crispin came into the room after having interviewed Hinson. Crispin introduced himself and defendant stated that he had a list in his pocket of names of people who would say he was somewhere else. Crispin asked for the list. Defendant responded with profanity and Crispin then got up and stood in front of defendant with his palm up and said, "let me see the paper. It's not going to help you unless I see it." Defendant then stood up and shoved Crispin causing him to fall down. Patitucci tried to grab defendant and a scuffle ensued as Crispin attempted to handcuff him. Crispin struck defendant twice, after which defendant complied, was handcuffed, and placed in a chair. Both Patitucci and Crispin then left the room.
Crispin asked Detective Rick Pierce to interview defendant. Pierce was told that defendant had been read his Miranda rights and that defendant and his mother had signed the juvenile rights form. Pierce entered the room. Defendant's mother was escorted back into the room. Pierce asked defendant's mother whether she had any problem with him speaking with defendant and noted that she and her son had signed the Miranda form. She responded in the negative and told defendant to be honest. Defendant was taken to an upstairs office so the interview could continue in a quieter place.
After defendant was asked what happened that night, he stated that he and his friends were at Maplewood Gardens looking for Mexicans, then went to Mary Elmer Park and approached a car occupied by an Hispanic male, which sped away. They continued and spotted a boat ramp where they saw a parked car occupied by a *1057 young man and woman. Defendant acknowledged that he knew the young man from school. They then confronted the two and one of his "associates" pulled the woman from the car, took her clothes off, and raped her. He also advised Pierce that after he had gotten oral sex from the woman and one of his associates hit the young man, the others took money and left. Pierce then decided to take a formal tape-recorded statement.
Before asking questions about the events of that evening, defendant was asked the following:
Q. [W]hen you were brought in, Keon ... were you read your rights?
A. Yes.
Q. From a juvenile form, which this is the form right here.
A. Detective Patitucci read me (indisc.)
Q. Okay and you also, you initialed the form, and your mom initialed the form, and then at the bottom you both signed this form.
A. Yes.
In his statement defendant identified the three accomplices. He essentially claimed that it was Hinson who robbed C.P. and Milbourne who took between $100 and $200 from K.M. and raped her. He indicated that they all got "head" from her and that he tried to prevent Milbourne from striking C.P. with the bat. He denied ever striking either victim.
Denying defendant's motion to suppress, the judge found that defendant understood the Miranda form he signed and that he acknowledged having signed it in front of both Patitucci and Pierce. He noted that, although it was not re-read to defendant, there was only a short lapse of time between when he was given his rights and when he gave the formal statement. The judge also found that, having heard the statement, it was not coerced but voluntarily given. He noted that defendant made no reference to the altercation with Crispin and gave detailed information in response to Pierce's questions.
On appeal, defendant asserts that he was not in custody until after he was handcuffed following the incident with Crispin, and that the Miranda warnings given by Patitucci were therefore meaningless. He claims that the recital of Miranda warnings was given to him when he was free to leave and was therefore premature, useless, and meaningless. He also asserts that his pushing of Crispin was tantamount to a request to terminate the interrogation, thus requiring a re-reading of his rights.
The State counters, asserting that under the circumstances defendant did not invoke his right to silence by assaulting Crispin, that the "arguable change" in defendant's custodial status after he was handcuffed for assaulting Crispin did not necessitate a re-reading of his Miranda rights and that the facts established that defendant re-acknowledged that he had received his Miranda rights on the taped statement prior to being asked questions concerning the offense.
If defendant is correct that his confrontation with Crispin amounted to an invocation of his right to remain silent, we need not decide whether the initial Miranda warnings were effective. A defendant's "right to remain silent is independent of the requirement that any waiver [of the Fifth Amendment privilege against self-incrimination] be knowing, intelligent, and voluntary." State v. Hartley, 103 N.J. 252, 261, 511 A.2d 80 (1986). As such, the right to remain silent is to be "scrupulously honored" by the police. Ibid. Thus, Hartley declared a bright line test that any statements made following the invocation of a suspect's right to remain silent is considered "unconstitutionally compelled, and hence inadmissible," unless the Miranda *1058 warnings are given anew. Id. at 267, 279, 511 A.2d 80. The defendant in Hartley was given Miranda warnings at the time of his arrest and immediately "asserted in clear and unequivocal terms his right to remain silent." Id. at 255, 257, 511 A.2d 80. At that time, no questions were asked of the defendant. Approximately one hour later, police approached Hartley and, without re-administering new Miranda warnings, reinitiated interrogation. Id. at 258-59, 511 A.2d 80. The Court determined that the investigator failed to scrupulously honor the defendant's invocation of the right to remain silent thus violating accused's privilege against self-incrimination. Id. at 256, 511 A.2d 80.
Viewing the circumstances here, we cannot agree with defendant that his hostility to Crispin constituted an invocation of his right. Indeed, his actions before and after the altercation bespoke a willingness to cooperate. He expressed the same calm readiness to talk to Pierce after the confrontation as he did with Patitucci before. Likewise, the interchange with his mother following the altercation evidenced compliance on his part to cooperate in his interrogation.
We consider next defendant's contention that his Miranda rights were ineffective and required renewal after he was handcuffed and presumably placed under arrest. We recently addressed when Miranda rights are necessitated in State v. Dispoto, 383 N.J.Super. 205, 891 A.2d 633 (App.Div.), certif. granted, 186 N.J. 358, 895 A.2d 448 (2006). In Dispoto, the State conceded that at the time defendant received his Miranda rights he neither was under arrest nor held for custodial interrogation. Id. at 213-14, 891 A.2d 633. Additionally, in Dispoto, there was a significant time lapse between when the police accompanied the defendant first to his office, then to his home before being arrested and when he gave his unwarned selfincriminating statement. Id. at 211, 891 A.2d 633. In Dispoto, we held, "[w]arnings previously given under circumstances that did not amount to either custodial interrogation or formal arrest did not vitiate the need to give the warnings again when required." Id. at 214-15, 891 A.2d 633. Miranda warnings are given with the purpose "to neutralize the pressure inherent in custodial interrogation." State v. Smith, 374 N.J.Super. 425, 433, 864 A.2d 1177 (App.Div.2005).
Whether a custodial interrogation exists is fact sensitive and depends upon the totality of the circumstances. State v. Pierson, 223 N.J.Super. 62, 67, 537 A.2d 1340 (App.Div.1988). "Pertinent factors include the duration of the detention, the nature and degree of the pressure applied to detain the individual, the physical surroundings of the questioning and the language used by the officer in summoning the individual." Ibid. Here, by contrast to the facts in Dispoto, the State does not concede that the initial questioning was not custodial nor that the circumstances were similar. Indeed, there is nothing in the record to indicate that defendant was free to leave. While it is true that defendant came voluntarily to City Hall, the record established that the police informed his mother that they wanted him to come to City Hall. At the time that Patitucci read defendant his Miranda rights, he was alone with defendant and defendant's mother in the interrogation room. He was thereafter alone with defendant after defendant's mother left. Crispin entered the room after interviewing a co-defendant. Clearly, there was an element of pressure on defendant. We are satisfied from our review that the facts are sufficient to establish a status equivalent to a custodial interrogation at the time defendant was first questioned, notwithstanding the change in status following the *1059 altercation with Crispin by defendant being placed in handcuffs.
We also agree with the State that Pierce's initial question established a reacknowledgement by defendant that his Miranda warnings had recently been given in the presence of his mother and that both had executed the juvenile form. Although such a re-acknowledgement without a complete re-read of defendant's Miranda rights would not suffice in the face of an effective assertion of the right to remain silent, such an assertion did not happen here. See Hartley, supra, 103 N.J. at 310, 511 A.2d 80.
Finally, we agree with the ultimate findings of the trial judge that the record established that defendant, with full knowledge of his legal rights, voluntarily, knowingly, and intentionally relinquished those rights. One need only look at the totality of the circumstances to come to the same conclusion. The short interval between the two interrogations, the identical subject matter of the questioning, defendant's re-acknowledgement that the warnings were given, and the lack of any evidence that the time lapse diluted his memory of those warnings all support the judge's findings. See State v. Tolbert, 381 Md. 539, 850 A.2d 1192, 1200(Md.), cert. denied, 543 U.S. 852, 125 S.Ct. 263, 160 L.Ed.2d 85 (2004).
[At the direction of the court, the discussion of the other issues in the appeal has been omitted from the published version of the opinion.]
NOTES
[1] Judge Cuff did not participate in oral argument. However, with the consent of counsel she has joined in this opinion. R. 2:13-2(b).
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).