**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1339-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent.

v.

KESHAWN MALONE, a/k/a
KESHAW MALONE,

    Defendant-Appellant.

_____

Submitted May 11, 2021 – Decided July 16, 2021

Before Judges Gilson and Moynihan.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Indictment No. 15-04-0466.

Joseph E. Krakora, Public Defender, attorney for appellant (David A. Gies, Designated Counsel, on the brief).

Mark Musella, Bergen County Prosecutor, attorney for respondent (William P. Miller, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Keshawn Malone and three codefendants executed their planned robbery of Erick Lopez, his father Jeronimo Lopez and five guests in the Lopez apartment, during which Jeronimo was shot and killed.[1] Tried separately, defendant was convicted by jury of second-degree conspiracy to commit burglary, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:18-2(b)(2) (count one); second-degree conspiracy to commit robbery, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:15-1 (count two); second-degree burglary, N.J.S.A. 2C:2-6 and N.J.S.A. 2C:18-2 (count three); first-degree robbery, N.J.S.A. 2C:2-6 and N.J.S.A. 2C:15-1 (counts four, five, six, seven, eight, and ten); first-degree murder, N.J.S.A. 2C:2-6 and N.J.S.A. 2C:11-3(a)(1), (2) (count eleven); first-degree felony murder (burglary), N.J.S.A. 2C:2-6 and N.J.S.A. 2C:11-3(a)(3) (count twelve); first-degree felony murder (robbery), N.J.S.A. 2C:2-6 and N.J.S.A. 2C:11-3(a)(3) (count thirteen); second-degree possession of a weapon for an unlawful purpose (handgun), N.J.S.A. 2C:2-6 and N.J.S.A. 2C:39-4(a) (count seventeen); second-degree unlawful possession of a weapon (handgun without the requisite permit, N.J.S.A. 2C:2-6 and N.J.S.A. 2C:39-5(b) (count eighteen);

___

[1] Our use of given names is for clarity. We mean no disrespect or familiarity by our practice.

A-1339-18

and third-degree hindering apprehension, N.J.S.A. 2C:2-6 and N.J.S.A. 2C:29-3(b)(1) (count twenty-two).

He appeals from the judgment of conviction and sentence, arguing:

POINT ONE

THE TRIAL JUDGE'S CONCLUSION THAT DEFENDANT'S WAIVER OF HIS RIGHT TO REMAIN SILENT DURING A CUSTODIAL INTERROGATION WAS VOLUNTARY WAS NOT BASED ON A TOTALITY OF CIRCUMSTANCES.

POINT TWO

FOR THE LAW ENFORCEMENT EXCEPTION OF THE NEW JERSEY WIRETAPPING ACT TO APPLY, THE STATE MUST PRODUCE THE SUBPOENA AUTHORIZING IT TO OBTAIN A DEFENDANT'S JAILHOUSE COMMUNICATIONS OR A RELIABLE EXPLANATION WHY THE SUBPOENA CANNOT BE PRODUCED.

POINT THREE

THE TRIAL JUDGE ERRED IN ADMITTING INTO EVIDENCE THE JAILHOUSE COMMUNICATIONS ON GROUNDS OF BOTH FUNDAMENTAL FAIRNESS AND HEARSAY.

POINT FOUR

THE TRIAL JUDGE'S DECISION TO CONSECUTIVELY SENTENCE DEFENDANT FOR THE ROBBERIES AND MURDER WAS AN ABUSE OF DISCRETION.

3

POINT FIVE

THE PERIOD OF PAROLE INELIGIBILITY UNDER NERA FOR A SENTENCE ON MURDER IS COMPUTED ON THE WHOLE TERM IMPOSED.

We affirm the conviction but remand for resentencing.

I

During the hearing on defendant's motion to suppress the statement he provided to detectives from the Bergen County Prosecutor's Office (BCPO), the trial judge heard testimony from then-Sergeant James McMorrow[2] who interviewed defendant with Fairview police Captain Martin Kahn following defendant's arrest two days after the crimes. As we "must uphold the factual findings underlying the trial court's decision so long as those findings are supported by sufficient credible evidence in the record," State v. Rockford, 213 N.J. 424, 440 (2013) (quoting State v. Robinson, 200 N.J. 1, 15 (2009)), we glean the pertinent supported facts from the trial judge's written decision. "Those factual findings are entitled to deference because the motion judge, unlike an appellate court, has the 'opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'" State v. Gonzales, 227 N.J. 77, 101 (2016) (quoting State v. Johnson, 42 N.J. 146, 161

---

[2] Apparently, McMorrow was promoted during the pendency of the case.

(1964)).  That deference is similarly accorded when a trial judge makes factual findings based on video and audio recordings entered in evidence.  State v. Tillery, 238 N.J. 293, 314 (2019); State v. S.S., 229 N.J. 360, 379-81 (2017). We review those factual findings the judge made from McMorrow's testimony and the judge's review of defendant's videotaped statement, photographs and the Miranda[3] card from which McMorrow read defendant his rights immediately after he was handcuffed.

Defendant was arrested with two of his codefendants after McMorrow stopped a 2004 Jeep, Freedom Edition, with distinctive chrome roof-racks and running boards, that looked similar to a vehicle seen on surveillance footage near the crime scene.  McMorrow handcuffed defendant, placed him in the rear of an unmarked police vehicle, told defendant detectives wanted to speak to him at the BCPO and read Miranda rights and concomitant waiver of rights to defendant who agreed to speak to detectives.  McMorrow brought defendant to the BCPO in Paramus without further conversation about the crimes.

McMorrow placed defendant in a BCPO interview room at 1:51 p.m., activated a recording device and then left the interview room to bring defendant

---

[3]  Miranda v. Arizona, 384 U.S. 436 (1966).

water he had requested. While alone, defendant made a personal call on his cell phone as depicted on the recorded video.

McMorrow returned at about 2:11 p.m. with Kahn and a water bottle for defendant. Although McMorrow testified the Miranda rights form which he read to defendant could not be located at the time of the hearing, the judge "observe[d on the videotape] defendant reading, initialing[] and signing the writing purporting to be the . . . form situated on the desk in the interview room."

At 2:20 p.m., general questions followed until about 3:04 p.m. when McMorrow informed defendant about the homicide investigation; defendant denied any involvement in the crime. Defendant requested a bathroom break at approximately 3:07 p.m. Breaks in questioning occurred at about 3:39 p.m., during which defendant was left alone in the room for approximately five minutes, and at 3:58 p.m., during which defendant used the restroom. Following the last break, defendant remained alone in the interview room until 5:12 p.m., when McMorrow returned to the interview room and informed defendant he was going to be taken to the Bergen County Sheriff's Department in Hackensack for the execution of a search warrant for buccal swab samples, fingerprints and photographs. Two minutes later, defendant was removed and transported for processing which was delayed for administrative reasons.

A-1339-18

On the return trip to the BCPO, McMorrow picked up fast food at a drive-through window and returned defendant to the BCPO interview room at 8:20 p.m. McMorrow activated the video-recording device; the two ate their meals. McMorrow testified he did not discuss the case with defendant to, from or at the Sheriff's Office, but began to discuss it toward the end of their meal.

At 8:42 p.m., defendant admitted participating in the robbery but denied possessing a weapon or recollecting a shooting. The detectives left defendant alone in the interview room at 9:03 p.m., returning forty-five minutes later to resume questioning, during which defendant acknowledged "someone . . . provided the information that a card game was occurring where $10,000 would be available to be stolen" and that "he had a black handgun with him when he entered the apartment building, although he did not shoot the victim."

After defendant declined a restroom break at 10:38 p.m., the detectives again left the interview room. They returned at 11:15 p.m. and asked defendant to identify from a series of photographs the person who set up the robbery. Defendant admitted striking Erick with a pistol to render him compliant during the robbery. The detectives exited the room at 11:41 p.m.; defendant was seen resting on the floor at 11:46 p.m. before reclining on one chair with his feet on another.

A-1339-18

McMorrow returned to the interview room at 12:30 a.m. and advised defendant one of the codefendants admitted shooting Jeronimo. Questioning ceased at 12:40 a.m. and defendant was placed in a holding cell.

The trial judge concluded defendant's statements were admissible because, under the totality of the circumstances, "the State [had] demonstrated beyond a reasonable doubt that [defendant] was apprised of his Miranda rights, knowingly and intelligently waived those rights, and provided voluntary statements to the detectives during the course of the custodial interrogation."

Defendant argues "the time lapse between his initial Miranda warnings and the more pointed questioning that led to his admissions was so protracted as to render the initial warnings stale, thereby requiring the law enforcement officers to readminister them." Defendant urges us to apply the Third Circuit's two-pronged test for determining "whether a lapse of time renders Miranda warnings stale":

> (1) At the time the Miranda warnings were provided, did the defendant know and understand his rights? (2) Did anything occur between the warnings and the statement, whether the passage of time or other intervening event, which rendered the defendant unable to consider fully and properly the effect of an exercise or waiver of those rights before making a statement to law enforcement officers?

[United States v. Pruden, 398 F.3d 241, 246-47 (3d Cir. 2005) (quoting United States v. Vasquez, 889 F. Supp. 171, 177 (M.D. Pa. 1995)).]

We have not found, and neither party cites to, a New Jersey case that specifically adopted the two-pronged Pruden-Vasquez test espoused by defendant. Indeed our Supreme Court rejected a "bright-line approach" suggested by our comment in State v. Dispoto, 383 N.J. Super. 205, 214-15 (App. Div. 2006), that pre-custodial Miranda warnings were per se ineffective and had to in all cases be readministered post-arrest for a waiver to be considered valid, State v. Dispoto, 189 N.J. 108, 124 (2007). The Court instead held "[a] totality-of-the-circumstances approach is preferable in that it encourages warnings when police question a suspect and allows law enforcement officials to pursue their investigations, subject to later review by a neutral court." Ibid.

To be sure, the Pruden-Vasquez prongs are included in a determination of the voluntariness of a statement which requires a review of "the totality of the circumstances surrounding the custodial interrogation," State v. A.M., 237 N.J. 384, 398 (2019); see also State v. Tillery, 238 N.J. 293, 316 (2019), and a determination of whether defendant's decision to waive his rights resulted from an impermissibly overborne will, see State v. Burris, 145 N.J. 509, 536 (1996). Our Supreme Court has held:

9                                                                          A-1339-18

> Every case must turn on its particular facts. In determining the issue of voluntariness . . . a court should assess the . . . characteristics of the suspect and the details of the interrogation. Some of the relevant factors include the suspect's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved. A suspect's previous encounters with the law has been mentioned as an additional relevant factor.
>
> [State v. Miller, 76 N.J. 392, 402 (1978) (citations omitted).]

"The time lapse between the reading of Miranda rights and the actual questioning or incriminating oral statement" is another factor to be considered. Tillery, 238 N.J. at 317 (citation and internal quotation marks omitted). But the Disposto Court highlighted the importance of what occurs during that time lapse:

> [W]hen . . . pre-custodial warnings have been given to a defendant as part of a continuing pattern of interactions between the defendant and the police, and during that continuing sequence of events nothing of an intervening nature occurs that would dilute the effectiveness of the warning that had been given, then there would appear to be no need to require that another warning be given. Such determinations are better suited to fact-based assessments rather than being made subject to bright-line pronouncements.
>
> [189 N.J. at 124-25.]

Defendant argues the trial judge failed to consider the totality of the circumstances including: "whether the more[-]than[-]four-hour interval between the first and second parts of the custodial interrogation affected the twenty-one[-]year[-]old defendant's understanding of the seriousness of the situation, rendering him unable to appreciate his waiver . . . ."; the periods during which defendant was isolated in the interview room; the change in questioning "from one of general information about defendant's pedigree to one of a more pointed inquiry about the robbery and murder"; his ignored 3:07 p.m. request for a bathroom break; and what occurred during the long processing at the Sheriff's Office. We disagree.

From the videotape of defendant's statement, the trial judge deduced that defendant "was given <u>Miranda</u> warnings both verbally and in writing. Despite the loss or misplacement of the <u>Miranda</u> form, the videotaped evidence corroborated McMorrow's testimony that the rights were read to [defendant]; he understood them; and agreed to speak to the detectives, waiving those rights." We note defendant does not dispute that he received <u>Miranda</u> warnings when he was first arrested after the motor vehicle stop.

Moreover, the judge considered the total length of the questioning but found "[t]he total period of actual questioning in the interview room was

approximately three and one-half hours, excluding bathroom breaks, the meal break, transport to and from the Sheriff's Office, and processing at the Sheriff's Office." Defendant was provided food and drink and was offered bathroom breaks, one of which he declined; defendant does not assert, and the record does not disclose, that he was in any discomfort. Nor is there any proof to contradict McMorrow's testimony that no discussions about the case took place during the break for processing at the Sheriff's Office.

Although the trial judge did not mention defendant's age, education or familiarity with the criminal justice system, defendant has not proffered any persuasive argument that those factors impacted the voluntariness of his statement. He was a twenty-one-year-old adult. He was not, as he contends, "inexperience[d]"; he had a five-year offense history, including juvenile adjudications for robbery and municipal court convictions for obstruction and drug paraphernalia possession. And, whatever his educational level, he appeared fully cognizant on the videotape. Indeed, there is nothing in the record that anything occurred during the entire period defendant was questioned, including the times he was left alone, that impacted his <u>Miranda</u> rights waiver. The trial judge found:

> During the videotape admitted into evidence, the [judge] observed [defendant's] demeanor to be calm

12

and stoic. He did not appear nervous or fidgety while seated at the table across from the detectives. The videotape evidence reveals no evidence that physical threats or mental coercion was employed by the detectives during the interview.

Although [defendant] was observed lying on the floor and on two chairs while left alone during the latter part of the interview, the [judge] is satisfied that during the entire time he was in custody, he was alert, oriented to time and place, and provided direct, responsive answers to the questions posed to him.

Those findings also militate against defendant's contention that the change in questioning from general to more "pointed" questions about the crimes impacted the totality of the circumstances. Even if the detectives' variation in questioning was not a mere progression in their investigation, but a designed attempt to elicit defendant's statement, "unlike the use of physical coercion, use of psychologically oriented interrogation techniques is not inherently coercive." State v. Cook, 179 N.J. 533, 562-63 (2004). The trial judge's findings manifest that defendant's will was not overborne by "very substantial psychological pressures." Id. at 563 (citation and internal quotation marks omitted).

Finally, we reject defendant's attempt to analogize our holding in State v. Milledge, 386 N.J. Super. 233 (App. Div. 2006). Defendant was immediately Mirandized upon arrest and again before any questioning began, and there was

13

no reason for the detectives to readminister <u>Miranda</u> warnings where defendant never invoked any right.

We discern no reason to disturb the trial judge's denial of defendant's motion to suppress his statement. The State met its burden and proved beyond a reasonable doubt that defendant knowingly, intelligently and voluntarily waived his Miranda rights, <u>see</u> <u>State v. Hreha</u>, 217 N.J. 368, 383 (2014); <u>State v. Nyhammer</u>, 197 N.J. 383, 400-01 (2009), and defendant's statement was voluntary and not the product of an overborne will, <u>State v. Galloway</u>, 133 N.J. 631, 654-55 (1993).

## II

Defendant argues the trial judge erred by admitting recordings of telephone calls defendant made while incarcerated in the Bergen County Jail— which the State introduced, contending defendant implicated himself in the crimes during the calls—because the officer who turned over those recordings to the BCPO did not produce the subpoena he received for their turnover or explain why he could not produce it.

Defendant skews our holding in <u>State v. Jackson</u>, 460 N.J. Super. 258, 273 (App. Div. 2019), <u>aff'd o.b.</u>, 241 N.J. 547 (2020), where we held "sharing the information with another law enforcement agency under the authority of a grand

jury subpoena is not a violation of the" New Jersey Wiretapping and Electronic Surveillance Control Act (the Act), N.J.S.A. 2A:156A-1 to -37, where the subject of the subpoena was recordings of monitored inmate telephone calls. We determined the creation of the recordings was not an "interception" within the purview of the Act or Title III of the Federal Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-2520. Ibid. We held it was logical that "sharing the information with another law enforcement agency under the authority of a grand jury subpoena [was] not a violation of the Act." Ibid. We did not hold, and no law requires, the State to produce the subpoena in order for recordings of inmate conversations to be admitted in evidence.

Bergen County Sheriff's Officer Jeffrey Ramirez, assigned to the Jail Security and Security Threat Group, testified at a N.J.R.E. 104 hearing that he turned over the recordings to the BCPO after receiving a subpoena. Defendant contends the trial judge did not make a credibility finding regarding Ramirez's testimony, but nothing has been proffered that would cast doubt on Ramirez's statement. In fact, defense counsel stated there was no reason for him to doubt the officer's veracity when he testified he received the subpoena.

The trial judge did not abuse his discretion when he admitted the recordings though the subpoena was not produced.  See State v. Granskie, 433 N.J. Super. 44, 48 (App. Div. 2013).

III

Nor did the trial judge abuse his discretion in rejecting defendant's fundamental fairness and hearsay objections to the recorded telephone conversations, which defendant reprises on appeal.

The conversations revealed to the jury that defendant was incarcerated from May 5 to May 11, 2014.  But that did not, as defendant contends, deny him a fair trial.  Any prejudice from that disclosure was remediated by the judge's instruction to the jury:

> One.  You heard, obviously, these are [j]ail calls.  You saw the statement by [defendant] that was some seven hours or whatever long.  And towards the end, he was advised that he was going to be arrested and put in [j]ail.
>
> [Y]ou shouldn't consider the fact that he was arrested on May 5th and these calls go through May 11th that— he was in [j]ail, that means he's guilty of any offense at all.
>
> . . . .
>
> [Y]ou . . . should not in any way presume or assume that he's guilty of any offense.  Obviously, if somebody's arrested—charged like this, they're going

16

> to be . . . confined in [j]ail.  And at least for this period of time that's what these calls—that's what this evidence is for.
>
> But don't at all, in any way take the fact that he was incarcerated back in 2014 indicate that he's guilty of anything today.

The jury is presumed to have followed that instruction.  See State v. Burns, 192 N.J. 312, 335 (2007) ("One of the foundations of our jury system is that the jury is presumed to follow the trial court's instructions.").

Defendant's hearsay argument does not challenge the trial judge's ruling that the recordings of defendant's statements were admissible under N.J.R.E. 803(b).  He contends the recordings should have been excluded because they had the capacity to "divert the jurors' attention from the proofs" and because "the incoherent nature of the jailhouse communications . . . minimized their probative value" and "heightened the prejudice attached to the jurors' knowledge that defendant was in custody."

The trial judge admitted the recordings as a hearsay exception under N.J.R.E. 803(b)(1).  Defendant did not request a Driver[4] hearing to contest (1) "the [recording] device was capable of taking the conversation or statement"; (2) "its operator was competent"; (3) "the recording is authentic and correct";

---

[4]  State v. Driver, 38 N.J. 255, 287 (1962).

(4) "no changes, additions or deletions have been made"; and (5) "in instances of alleged confessions, that the statements were elicited voluntarily and without any inducement." 38 N.J. at 287. Defendant does not argue the recordings were inaudible or unintelligible because of a recording defect; rather he argues defendant's statements could be interpreted in a number of ways. The judge did not err in leaving that interpretation to the jury. The judge found the recordings relevant in that one of those interpretations was that defendant made admissions related to the crimes. Again, the judge's instruction cured any prejudice.

Lastly, we determine defendant's arguments that the judge erred because the recordings were unreliable, reiterating they were incoherent and that the PIN numbers used to identify each inmate caller were "often sold or stolen," are without sufficient merit to warrant further discussion. R. 2:11-3(e)(2). Threshold reliability was established by Ramirez who testified he had heard defendant speak on "numerous occasions," knew his "distinctive voice" and recognized the voice of the caller on the recordings as defendant. See State v. Gallagher, 286 N.J. Super. 1, 15-16 (App. Div. 1995). We discern no error in the trial judge's admission of the recordings.

IV

18

The trial judge, after mergers, imposed prison terms of thirty-eight years with thirty years parole ineligibility, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, on count eleven for first-degree murder; fifteen-year terms subject to NERA on each of the first-degree robbery counts—five through eight and ten;[5] seven years with forty-two months of parole ineligibility, subject to NERA and the Graves Act, N.J.S.A. 2C:43-6(c), on count eighteen for second-degree unlawful possession of a handgun; and four years on count twenty-two for third-degree hindering apprehension. The judge determined the terms for all robberies were concurrent to each other but consecutive to the term imposed for murder.

Defendant challenges that determination arguing the judge failed to take into account that the objectives of the robberies and murder were not distinct because

> [t]he scheme was to abscond with the pot of money found at the high-stakes poker game. Indeed, the co[]defendants brought weapons to the apartment. Because the co[]defendants used weapons to accomplish their task, it is difficult to conceive for

---

[5] The judge merged count four charging first-degree robbery into count twelve charging first-degree felony murder because they both pertained to Jeronimo; in turn, he merged count twelve into count eleven. Defendant was acquitted on count nine charging first-degree robbery of a separate victim at the Lopez apartment.

A-1339-18

> purposes of determining whether the sentences should be served consecutive to one another that the objectives of the two crimes were predominantly independent from the other.

Defendant also argues the robberies and murder occurred "during a single period of aberrant behavior where both crimes were committed at the same time and place." He adds, he was not "the shooter" who killed Jeronimo and the trial judge did not properly consider his role.

Trial courts "have discretion to decide if sentences should run concurrently or consecutively." State v. Miller, 205 N.J. 109, 128 (2011); see also N.J.S.A. 2C:44-5(a). In State v. Yarbough,[6] our Supreme Court established factors that a sentencing court must consider when deciding whether to impose consecutive sentences:

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;

> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;

---

[6] 100 N.J. 627, 643-44 (1985), superseded by statute in part, N.J.S.A. 2C:44-5(a), as recognized in State v. Cuff, 239 N.J. 321, 348 n.4 (2019), rehearing denied, 244 N.J. 502 (2020) (noting the statute's elimination of a sixth factor originally set forth in Yarbough that set an outer limit on the overall cumulation of consecutive sentences).

(3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:

> (a) the crimes and their objectives were predominantly independent of each other;
>
> (b) the crimes involved separate acts of violence or threats of violence;
>
> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>
> (d) any of the crimes involved multiple victims;
>
> (e) the convictions for which the sentences are to be imposed are numerous;

(4) there should be no double counting of aggravating factors;

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense[.]

"When a sentencing court properly evaluates the [remaining] Yarbough factors in light of the record, the court's decision will not normally be disturbed on appeal." Miller, 205 N.J. at 129.

The trial judge recognized he was required to set forth reasons for imposing consecutive sentences and recited the Yarbough standards, concluding "the purpose underlying the specific standards that I'm about to [impose] is to

achieve the [New Jersey Code of Criminal Justice's] paramount sentencing goals that the punishment should fit the crime and not the criminal, and that there's a predictable degree of uniformity in sentencing."  The judge, however, failed to review each of the factors as they relate to defendant's crimes, stating only

> that the crime of robbery was distinct and independent from the . . . actual murder charge, that the robbery itself was a separate act of violence.  Each of these victims, and particularly the victim that this defendant encountered, was struck with a weapon.  Many of the other victims were likewise brutalized, although not murdered, and this defendant, as an accomplice, is responsible for all of the robberies.  I find, therefore, weighing the [Yarbough] factors, that the robbery charges should be consecutive to the murder charge.

This general statement was insufficient, especially considering the judge found "all of the . . . robbery charges . . . are concurrent to each other, it's all one action."

We do not imply the judge should not have imposed consecutive sentences; we take no position how the judge should exercise his sentencing discretion.  But we determine the judge abused his discretion, see State v. Jones, 232 N.J. 308, 318 (2018), by failing to carefully analyze each of the pertinent factors in relation to defendant's actions toward each of the victims of the robberies to which the judge chose to impose a consecutive sentence.  We further note the judge, in "performing the Yarbough fairness assessment must be

mindful that aggravating and mitigating factors and <u>Yarbough</u> factors, as well as the stated purposes of sentencing in N.J.S.A. 2C:1-2(b), in their totality, inform the sentence's fairness" which "cannot be divorced from consideration of the person on whom it is imposed. . . . Assessing the overall fairness of a sentence requires a real-time assessment of the consequences of the aggregate sentences imposed." <u>State v. Torres</u>, ___ N.J. ___, ___ (2021) (slip op. at 32, 34).

On remand, the trial judge should provide "an explanation for the overall fairness of [the newly imposed State prison] sentence . . . to 'foster[] consistency in . . . sentencing in that arbitrary or irrational sentencing can be curtailed and, if necessary, corrected through appellate review.'" <u>Id.</u>, (slip op. at 33) (alteration in original) (quoting <u>State v. Pierce</u>, 188 N.J. 155, 166-67 (2006)).

The State concedes defendant's argument that the judge erred when he seemingly imposed NERA's parole ineligibility period only on that portion of the thirty-eight-year sentence that exceeded the thirty-year period mandated by N.J.S.A. 2C:11-3(b)(1), stating the term was "[thirty-eight] years on the murder charge, with a period of [thirty] years that is mandatory, plus NERA, so it's approximately about [thirty-six]—[thirty-five, thirty-six] years he's going to have to serve before being eligible for parole on the murder charge." When

sentencing a defendant for, among other crimes, first-degree murder, NERA requires the judge to "fix a minimum term of 85% of the sentence imposed, during which the defendant shall not be eligible for parole." N.J.S.A. 2C:43-7.2(a) (emphasis added). "[T]he parole ineligibility provisions of NERA . . . apply to the whole term imposed for murder, not just the period in excess of the mandatory thirty-year parole disqualifier which is required for any sentence for murder." State v. Rambo, 401 N.J. Super. 506, 522 (App. Div. 2008); see also N.J.S.A. 2C:11-3(b). On remand, the judge should clarify that the NERA parole ineligibility period applies to the entire term.

Defendant's conviction is affirmed; remanded for resentencing. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION