# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2011-22

B.B.,

    Plaintiff-Respondent,

v.

D.R., III,

    Defendant-Appellant.

_____

Submitted March 6, 2024 – Decided February 5, 2025

Before Judges Gummer and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Ocean County, Docket No. FV-15-1111-23.

Dwyer, Bachman, Newman & Solop, attorneys for appellant (Elliot Steven Solop, of counsel and on the brief; Lauren Conway, on the brief).

Respondent has not filed a brief.

    The opinion of the court was delivered by

GUMMER, J.A.D.

Defendant D.R. appeals from a final restraining order (FRO), which was entered pursuant to the Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35.[1] Defendant argues the trial judge erred in finding a predicate act of domestic violence and that the FRO was needed to ensure plaintiff's future protection. Because the judge's findings were supported by adequate, substantial evidence, including testimony he found credible, we affirm.

## I.

We glean these facts from the record. The parties were never married and share two children who were one- and three-years old at the time the trial judge issued the FRO.

On December 12, 2022, plaintiff obtained a temporary restraining order (TRO) against defendant. That day, she filed a domestic-violence complaint in which "terroristic threats" was checked as the criminal offense at issue. In the complaint, plaintiff described an incident that had taken place the prior weekend. According to plaintiff, defendant had packed a bag and left their house because they had been arguing about his purported drug use. Plaintiff alleged that while she was talking on the telephone to defendant's stepmother on December 10,

---

[1] We use initials to protect the confidentiality of the participants in these proceedings. R. 1:38-3(d)(10).

2022, which was a Saturday, she overheard defendant screaming three times "he was going to kill [her]." Plaintiff called the police and was advised to wait until Monday to contact the court to file a TRO. According to plaintiff, defendant returned on Sunday, spent the night, and, on Monday morning, banged repeatedly on the locked bathroom door while she was showering and attempted to take her car. He left before police arrived.

The complaint form asked if the parties had any prior history of domestic violence, either reported or unreported. Plaintiff responded "yes" and provided the following information:

> August 2022: [plaintiff] had confronted [defendant] about his drug use, [defendant] admitted to drug use and [plaintiff] hit his shoulder [and] asked how could you. [Defendant] threw her to the floor, kicked her multiple times, choked her. This resulted in [plaintiff] having a bloody lip. [Defendant] also physically prevented [plaintiff] from leaving by blocking the door.
>
> On one occasion[ defendant] called his stepmother on speakerphone and said in multiple different ways that he wished [plaintiff] would die. [Defendant] has taken [plaintiff]'s car keys, wallet, cell phone, credit cards on several different occasions and left the house, telling her she doesn't own anything. [Plaintiff] states [defendant] takes her items from her saying she doesn't pay for it. [Defendant] has physically pushed [plaintiff] out of the house then took batteries out of their electronic door handle, preventing her from being able to get back into the house.

On January 23, 2023, the judge conducted a trial on plaintiff's application for an FRO. Plaintiff represented herself at trial; defendant was represented by counsel. Both parties testified.

Plaintiff testified about the incidents alleged in the complaint. According to plaintiff, on December 10, 2022, she had contacted defendant's stepmother by telephone to tell her defendant had "been using drugs" and that "he was at another woman's house." While she was on the phone, she overheard defendant enter his stepmother's home and say, "I'm going to fucking kill her, I'm going to fucking kill her, I'm going to fucking kill her." According to plaintiff, she took this statement as a "serious threat," recognizing they "ha[d] a gun in the home." Plaintiff testified she had waited an hour before calling the police and was advised "to wait until Monday morning to file a TRO." Plaintiff also stated she had moved the gun to another location within the home to hide it from defendant. Plaintiff testified defendant had returned to the parties' home on Sunday and spent the night. She then described the altercation that had taken place on Monday morning. Her testimony about the events that took place December 10 through 12, 2022, was consistent with the description she had set forth in the complaint.

A-2011-22

Plaintiff also testified about the past incidents of domestic violence she had described in the complaint. Plaintiff testified about the events of August 2022, in which she had confronted defendant about his drug use. She described herself as being "extremely upset" and "verbally abused" in that he had been "calling [her] crazy and psycho for his drug use." According to plaintiff, she "shoved the top of his shoulders" while screaming, "How could you do this? How could you call me crazy?" Defendant then "pushed [her] down to the floor and . . . kicked [her] three times in [her] left glute" after which he "took his knee into the center of [her] back with [her] head into the carpet and . . . choked [her]." He would not let her leave the room for several minutes.

Plaintiff entered into evidence twelve photographs depicting the injuries she had suffered in that incident. Plaintiff testified the photographs originally were on her phone, but defendant had deleted them. Plaintiff stated one night when defendant was asleep, she went on his phone, texted copies of the photographs to her phone, and deleted those texts from his phone. The photographs displayed plaintiff's bruised and bloody lip, various bruises, marks on her neck and chest, and a scratch on her arm. According to plaintiff, one photograph of her neck showed "where he had his finger marks [and] choked [her]" and another showed "the bruising starting on [her] neck where his thumb

5

and where his other fingers were placed, his index fingers and his thumb you can see." She testified she had felt the effects of the chokehold for a month and that defendant knew she "couldn't swallow correctly . . . ."

Plaintiff testified about the other incidents referenced in her complaint. According to plaintiff, three or four months ago, defendant had stated "in multiple different ways that he . . . wished that [she] would die," including that "he wishe[d] [she] got in a car accident and [she] would die" and wished she would kill herself. In addition, plaintiff testified that on "at least ten different occasions" defendant had taken her car keys, wallet, cellphone, and credit card "as punishment." Plaintiff played a recording of an October 17, 2022 argument during which defendant had taken plaintiff's car keys and wallet. She testified about another incident in which defendant had pushed her outside on a cold night when she was wearing pajamas and locked the door; she reentered the house by climbing through a window.

Plaintiff also attempted to play a recording of "a [thirty]-minute confession of [defendant's] drug use . . . describ[ing] his verbal abuse." Defense counsel objected, contending the recording went beyond the allegations of the complaint. The judge sustained the objection and told plaintiff she was

permitted to give "testimony about anything that's within the four corners of the complaint . . . as initially pled or as amended."

The judge asked plaintiff if she was afraid of defendant, and she responded, "I am." When asked why she believed she needed an FRO, plaintiff testified she feared for her and her children's safety. She explained:

> [H]e's unpredictable. I don't know what he is capable [of]. When he is on drugs, he's a completely different person. His anger towards me has shown that. I don't want any further physical contact with him, I don't want him to hurt me again. I'm afraid for my children being in the home and he has drugs in the home. God forbid . . . my children find the drugs in the home and they take the drugs.
>
> . . . .
>
> I fear for my life, I fear that he had a gun in the home. I . . . believe that he was honest when he said that he was going to kill me because he was in such rage and such anger towards me that I believe that it is a possibility, especially since he had choked me so violently.

On cross-examination, plaintiff testified she had "filed the restraining order because [she was] scared for [her] life and he stated that he was going to kill [her], which she took [as] a very serious threat." But she admitted that after the TRO was entered, she had reached out to defendant several times and had sent him text messages asking him about a possible reconciliation.

7

Regarding the December 2022 events, defendant testified he had left the house after the parties argued on Friday evening, stayed at his parent's house, and returned to the parties' house on Sunday to spend time with the children. He admitted the parties had had a disagreement Monday morning regarding the use of a vehicle but maintained he needed it to go to work. Defendant claimed he "never laid [his] hands on [plaintiff]" and had "never hit another female in [his] whole life." He asserted plaintiff had obtained the TRO because she thought he "was cheating on her." Defendant denied threatening to kill plaintiff or stating he wished she would die. Defendant also denied he had taken anything from plaintiff. Regarding the August 2022 incident, he denied choking plaintiff and claimed he had held her down because she was hitting him. Defendant accused plaintiff of being verbally abusive towards him and asserted she had screamed at him and had thrown and broken things in front of their children. Defendant testified the parties' relationship was over except for the need to co-parent their children.

On January 27, 2023, the judge granted plaintiff's application, issued the FRO, and placed his decision on the record. The judge noted the parties had presented "two diametrically opposed versions of the incidents between" them. The judge found plaintiff to be credible and defendant not credible.

8

Regarding the August 2022 incident, the judge explained he "was struck by [plaintiff's] testimony that she had difficulty swallowing for [thirty] days, and that defendant knew of that circumstance." The judge found the twelve photographs admitted into evidence were "consistent with [plaintiff's] version of the assaultive behavior," referencing "specifically, the finger marks on her neck, the abrasion [on] her chest, face, consistent with the plaintiff's version . . . of the assault." The judge found defendant's description of the incident was "inconsistent with the injuries depicted on the photographs . . . ." The judge also noted defendant's stepmother, who was on the telephone with plaintiff on December 10, 2022, and "would have heard of any threats, was not called as a witness." The judge found "defendant was not forthcoming or truthful when he testified under oath he denied assaulting the plaintiff or that he ever laid his hands on a female." The judge concluded "[g]iven . . . defendant's threats to fucking kill her," which plaintiff had overheard, "it is objectively reasonable that with a firearm in the house, plaintiff was fearful for her safety, particularly following the assault of August 2022, just four months earlier than the threats to kill."

The judge found that while "every element" was not met for terroristic threat, "certainly the statement, 'I'm gonna fucking kill you.' is made under

[N.J.S.A.] 2C:33-4, an offensively coarse language, designed to annoy or seriously alarm." Therefore, the judge held "plaintiff ha[d] proven . . . defendant uttered threats by a preponderance of the evidence." Referencing the second prong under Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006), the judge also found that "the choking incident makes it objectively reasonable for . . . plaintiff to be fearful and warrant a[n FRO] to prevent further abuse" and that her "efforts for a reconciliation by text messages around the Christmas holidays" did not "militate against her fears." As a result, the judge granted plaintiff's application and issued an FRO. After the judge placed his decision on the record, the judge and the parties addressed parenting-time issues.

On appeal, defendant argues the trial judge erred in finding a predicate act of domestic violence and that it abused its discretion in finding an FRO was necessary to protect plaintiff. Unpersuaded by his arguments, we affirm.

II.

The scope of our review is limited in an appeal involving an FRO issued after a bench trial. C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020). "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise between

couples.'" Ibid. (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)). "[D]eference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" MacKinnon v. MacKinnon, 191 N.J. 240, 254 (2007) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)). "The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare, 154 N.J. at 411-12; see also Gnall v. Gnall, 222 N.J. 414, 428 (2015).

We defer to a trial judge's factual findings unless they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)); see also C.C., 463 N.J. Super. at 428. We defer to a trial judge's credibility determinations. Gnall, 222 N.J. at 428. We review de novo a trial judge's legal conclusions. C.C., 463 N.J. Super. at 429.

The entry of an FRO under the PDVA requires the trial court to make certain findings pursuant to a two-pronged analysis set forth in Silver, 387 N.J. Super. at 125-27. Under the first prong, the court "must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id.

11

at 125 (citing N.J.S.A. 2C:25-29(a)). Terroristic threats, N.J.S.A. 2C:12-3, and harassment, N.J.S.A. 2C:33-4, are among the predicate acts included in N.J.S.A. 2C:25-19(a). See N.J.S.A. 2C:25-19(a)(3), (13).

Proof of terroristic threats is measured by an objective standard. State v. Dispoto, 189 N.J. 108, 122 (2007). "In the domestic violence context, an act of terroristic threats requires that (1) the abuser threatened the victim; (2) the abuser intended to threaten the victim; and (3) 'a reasonable person would have believed the threat.'" Id. at 121-22 (quoting Cesare, 154 N.J. at 402). For a threat to be actionable, an abuser does not have to communicate it directly to the victim; "it is sufficient that 'the threat be made under circumstances under which it carries the serious promise of death.'" Id. at 122 (quoting Cesare, 154 N.J. at 403).

A person commits harassment,

> if, with purpose to harass another, he:
>
> a.  Makes, or causes to be made, one or more communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> b.  Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or

c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

[N.J.S.A. 2C:33-4(a) to (c).]

"The purpose to be served by enactment of the harassment statute [was] to make criminal, private annoyances that are not entitled to constitutional protection." State v. Hoffman, 149 N.J. 564, 576 (1997). "[C]ommunications only ha[ve] to 'cause annoyance or alarm' to qualify as harassment[.]" State v. Higginbotham, 257 N.J. 260, 287 (2024) (emphasis omitted) (quoting N.J.S.A. 2C:33-4(a)). "A finding of a purpose to harass may be inferred from the evidence presented." Hoffman, 149 N.J. at 577. "Common sense and experience may inform that determination." Ibid.

Defendant does not argue on appeal there was insufficient evidence to support the judge's conclusion he had harassed plaintiff. He does not claim his actions, described by plaintiff in testimony the judge found credible, fell outside the penumbra of harassment. Instead, he contends the judge could not "sua sponte, amend the [p]laintiff's TRO to include a different predicate act without notice to the [d]efendant."

We recognize "it is clearly improper to base a finding of domestic violence upon acts or a course of conduct not even mentioned in the complaint." L.D. v.

W.D., 327 N.J. Super. 1, 4 (App. Div 1999). But that's not what happened here. The judge's finding of harassment was based on the evidence presented at trial, and that evidence was consistent with the factual allegations set forth in the complaint. And defendant does not contend otherwise. Cf. J.D., 207 N.J. at 479-82 (finding trial court violated pro se defendant's due-process rights by not adjourning the trial when he said he "really wasn't prepared" to address plaintiff's testimony adding to the prior history of domestic violence alleged in the complaint); H.E.S. v. J.C.S., 175 N.J. 309, 324 (2003) (finding trial court violated defendant's due-process rights when it denied his adjournment request after plaintiff had testified about a domestic-violence incident not alleged in the complaint and granted an FRO based on that newly-asserted incident); L.D., 327 N.J. Super. at 4 (reversing an FRO when "[m]uch of the testimony was outside the four corners of plaintiff's domestic violence complaint"). In fact, when plaintiff attempted to play a recording of events that were beyond the allegations of the complaint, the judge sustained defense counsel's objection.

Defendant characterizes the judge's harassment finding as an improper amendment. A trial court's "broad power of amendment should be liberally exercised at any stage of the proceedings, including on remand after appeal, unless undue prejudice would result." Kernan v. One Wash. Park Urban

14

Renewal Assocs., 154 N.J. 437, 457 (1998) (quoting Pressler, <u>Current N.J. Court Rules</u>, cmt. on <u>R.</u> 4:9-1 (1998)).  An amendment would not impose undue burden or be unfair to a defendant where the original and new "claims are based on closely related factual allegations."  <u>Coastal Grp., Inc. v. Dryvit Sys., Inc.</u>, 274 N.J. Super. 171, 181 (App. Div. 1994); <u>see also</u> <u>Jersey City v. Hague</u>, 18 N.J. 584, 602 (1955) ("Broad power of amendment is contemplated by the rules . . . at any stage of proceedings, and is permitted except when justice to a party prejudiced thereby requires that it be forbidden.").

Defendant does not assert he was prejudiced by the purported amendment. He has not identified any additional witness he would have called, evidence he would have presented, testimony he would have given, or trial strategy he would have employed had the "harassment" box been checked on the complaint form. After the judge rendered his opinion, defense counsel did not request to re-open the case to present evidence or argument regarding the finding of harassment. <u>Cf.</u> <u>J.D.</u>, 207 N.J. at 479-80 (noting defendant told court he was not prepared to respond to new factual allegations of domestic violence); <u>H.E.S.</u>, 175 N.J. at 324 (noting defendant requested an adjournment when court permitted plaintiff to testify about a domestic violence incident not alleged in the complaint).

On this record, where the judge limited plaintiff's trial presentation and its consideration to evidence about the domestic-violence incidents alleged in the complaint and where defendant has not demonstrated any prejudice by the judge's "amendment," we perceive no abuse of discretion or error in the judge's finding plaintiff met the first prong of Silver, 387 N.J. Super. at 125, by proving the predicate act of harassment.

The finding of a predicate act "does not automatically warrant issuance of a domestic violence restraining order." R.G. v. R.G., 449 N.J. Super. 208, 224 (App. Div. 2017) (quoting Silver, 387 N.J. Super. at 124). Under Silver's second prong, the court must determine whether a restraining order is necessary to protect the plaintiff from immediate harm or further acts of violence. 387 N.J. Super. at 127; see also D.M.R. v. M.K.G., 467 N.J. Super. 308, 322 (App. Div. 2021) (finding "the judge must determine whether a restraining order is necessary to protect the plaintiff from future danger or threats of violence").

That determination must be made based on a totality-of-the-circumstances analysis. See C.C., 463 N.J. Super. at 436 (finding "the credible evidence in the record support[ed] the [trial] judge's decision that the FRO was necessary to protect plaintiff from immediate danger or future abuse" where "plaintiff's testimony established the totality of defendant's conduct placed her in fear"). A

previous history of domestic violence between the parties is one of the factors a court considers in determining whether a restraining order is necessary to protect the plaintiff. N.J.S.A. 2C:25-29(a)(1); see also D.M.R., 467 N.J. Super. at 324-25 (whether a judge should issue a restraining order depends, in part, on the parties' history of domestic violence); R.G., 449 N.J. Super. at 224 (finding that under prong two of the Silver analysis, trial court must "find a basis, upon the history of the parties' relationship, to conclude the safety of the victim is threatened and a restraining order is necessary to prevent further danger to person or property").

Defendant challenges the trial judge's determination that an FRO was necessary to protect plaintiff, contending none of the factors identified in N.J.S.A. 2C:25-29(a) support the issuance of an FRO. We recognize the better course would have been for the judge to address each of the factors listed in N.J.S.A. 2C:25-29(a). But the evidence nevertheless supported the finding that an FRO was necessary to protect plaintiff "from future danger or threats of violence," D.M.R., 467 N.J. Super. at 322, considering the threats defendant already had made, the history of domestic violence including a choking incident that occurred months before and left plaintiff with documented bruises on her

neck and elsewhere, and the likelihood of future contact given the parties' on-going co-parenting relationship.

The trial judge clearly found credible plaintiff's testimony about the history of the parties' interactions and the domestic-violence incidents at issue. Considering that evidence, the judge found "it objectively reasonable for the plaintiff to be fearful" and that an FRO was "warrant[ed] . . . to prevent further abuse." We have no reason to disturb the judge's credibility findings. And because his determination under prong two of <u>Silver</u> was supported by adequate, substantial, credible evidence in the record, we have no basis to disturb that finding.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION